# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANTS:**
*(AVISO AL DEMANDADO):*
Additional Parties Attachment form is attached

**YOU ARE BEING SUED BY PLAINTIFFS:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MELISSA MORRISON, an individual; KELLIE VALENCIA, an individual; KARIE KUEHL, an individual

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
06/15/2022 at 01:41:00 PM
Clerk of the Superior Court
By Gabriel Lopez, Deputy Clerk

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>San Diego County Superior Court<br>330 W. Broadway<br>San Diego, CA 92101 | CASE NUMBER:<br>*(Número del Caso):*<br>37-2022-00023174-CU-MT-CTL |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Christopher R. Rodriguez SBN 212274 Andrew D. Bluth SBN 232387
Singleton Schreiber, LLP, 1414 K Street, #470, Sacramento, CA 95814
Telephone: (916) 248-8478 Facsimile:

| | | |
|---|---|---|
| DATE:<br>*(Fecha)* 06/16/2022 | Clerk, by<br>*(Secretario)* G. Lopez | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* Janssen Research & Development LLC
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)     ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☒ other *(specify):* LLC
4. ☒ by personal delivery on *(date):*

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | American LegalNet, Inc.<br>www.FormsWorkflow.com |
| | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov | |

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Morrison, et al. v. TEVA Branded Pharmaceutical Products R&D, Inc., et al. | |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC.; TEVA PHARMACEUTICALS USA, INC.; ALZA CORPORATION; JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a Johnson & Johnson Research & Development, LLC; ORTHO-MCNEIL PHARMACEUTICAL, LLC; JANSSEN PHARMACEUTICALS, INC., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., f/k/a Janssen Pharmaceutica Inc.; JANSSEN ORTHO LLC; JOHNSON & JOHNSON; DR. C. LOWELL PARSONS, MD, an individual; and DOES 1-20.

Page ___2___ of ___2___

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1  **SINGLETON SCHREIBER, LLP**
   CHRISTOPHER R. RODRIGUEZ, SB# 212274
2    E-Mail: crodriguez@singletonschreiber.com
   ANDREW D. BLUTH, SB# 232387
3    E-Mail: abluth@singletonschreiber.com
   1414 K Street, Suite 470
4  Sacramento, California 95814
   Telephone: (619) 333-7479
5
   Attorneys for Plaintiffs, MELISSA MORRISON,
6  KELLIE VALENCIA, and KARIE KUEHL

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
**06/15/2022** at 01:41:00 PM
Clerk of the Superior Court
By Gabriel Lopez, Deputy Clerk

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                        COUNTY OF SAN DIEGO

9

10  MELISSA MORRISON, an individual;        CASE NO.  37-2022-00023174-CU-MT-CTL
    KELLIE VALENCIA, an individual; and
11  KARIE KUEHL, an individual.             **CLASS-ACTION (7TH CAUSE OF
                                            ACTION ONLY)**
12                 Plaintiffs,
                                            **COMPLAINT FOR (1) STRICT
13         v.                               LIABILITY (FAILURE TO WARN); (2)
                                            STRICT LIABILITY (DEFECTIVE
14  TEVA BRANDED PHARMACEUTICAL             DESIGN); (3) BREACH OF EXPRESS
    PRODUCTS R&D, INC., f/k/a Teva Global   WARRANTY; (4) BREACH OF IMPLIED
15  Respiratory Research, LLC.; TEVA        WARRANTY; (5) NEGLIGENCE; (6)
    PHARMACEUTICALS USA, INC.; ALZA         FRAUD/CONCEALMENT; AND (7)
16  CORPORATION; JANSSEN RESEARCH           UNFAIR COMPETITION (CLASS
    & DEVELOPMENT LLC f/k/a Johnson &       CLAIM)**
17  Johnson Research & Development, LLC;
    ORTHO-MCNEIL PHARMACEUTICAL,
18  LLC; JANSSEN PHARMACEUTICALS,
    INC., f/k/a Ortho-McNeil-Janssen
19  Pharmaceuticals, Inc., f/k/a Janssen
    Pharmaceutica Inc.; JANSSEN ORTHO
20  LLC; JOHNSON & JOHNSON; DR. C.
    LOWELL PARSONS, MD, an individual;
21  and DOES 1-20.
22
                   Defendants.
23

24

25

26

27

28

                                      1
                                 COMPLAINT

**COMPLAINT**

1   COMES NOW PLAINTIFFS, MELISSA MORRISON, KELLIE VALENCIA, and

2   KARIE KUEHL (and, with respect to the Seventh Cause of Action only, all others similarly

3   situated) (collectively, "Plaintiffs"), and by and through Plaintiff's undersigned counsel, hereby

4   submit this Complaint and jury demand against Defendants, TEVA BRANDED

5   PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC.;

6   TEVA PHARMACEUTICALS USA, INC., JANSSEN PHARMACEUTICALS, INC. f/k/a

7   Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc.; ORTHO-MCNEIL

8   PHARMACEUTICAL, LLC; JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a Johnson &

9   Johnson Research & Development, LLC; ALZA CORPORATION; JANSSEN ORTHO LLC;

10  JOHNSON & JOHNSON; DR. C. LOWELL PARSONS, MD, and DOES 1 through 20

11  (collectively, "Defendants"), upon information and belief and based upon the investigation of

12  counsel, thereby Plaintiffs state and allege as follows:

**INTRODUCTION**

13  1.      This is an action for damages related to Defendants' wrongful conduct in connection

14  with the development, testing, clinical trials, manufacturing, packaging, labeling, promoting,

15  advertising, marketing, sales, and distribution of pentosan polysulfate sodium (PPS) as Defendants'

16  prescription drug Elmiron® (hereinafter "Elmiron").

17  2.      Defendants manufacture, test, promote, advertise, market, distribute and sell Elmiron

18  as a prescription drug for the treatment of Interstitial Cystitis (also known as "IC" or "bladder pain

19  syndrome"). Elmiron is manufactured as a capsule suitable for oral consumption.

20  3.      Elmiron injured the Plaintiffs by causing harmful, but latent, irreversible damage to

21  Plaintiffs, MELISSA MORRISON, KELLIE VALENCIA, and KARIE KUEHL, resulting in

22  severely impaired vision.

23  4.      Numerous patient reports, adverse events reports, scientific studies, and even alerts

24  by governmental agencies alerted Defendants that Elmiron causes damage to the retina and

25  maculopathy.

26  5.      In addition to the serious safety risks associated with Elmiron, early clinical studies

2

COMPLAINT

1    relied upon by Defendants to support the approval of the drug failed to demonstrate Elmiron was an

2    efficacious treatment for IC.

3        6.      Additional studies also demonstrate Elmiron is no more effective than a placebo for

4    the treatment of IC.

5        7.      Nevertheless, at all times relevant hereto Plaintiffs, MELISSA MORRISON,

6    KELLIE VALENCIA, and KARIE KUEHL were prescribed, purchased and ingested Elmiron.

7        8.      Defendants failed to warn, advise, educate, or otherwise inform Elmiron users,

8    including Plaintiffs, prescribers, and governmental regulators in the United States about the risk of

9    damage to the patient's eyes, vision, retina, macula or the need for medical, ophthalmological testing

10   and/or monitoring.

11       9.      Indeed, at all times, Plaintiffs were prescribed, purchased and ingested Elmiron, the

12   U.S. label did not contain any warning regarding the risk to patients' eyes, vision, retina, macula or

13   the need for medical, ophthalmological testing and/or monitoring associated with the use of Elmiron,

14   despite Defendants having knowledge regarding these risks.

15       10.     As a proximate result of Defendants' negligent, reckless, grossly negligent, willful

16   disregard and wrongful actions, inactions and/or conduct, Plaintiffs were injured and suffered

17   damages from the use of Elmiron.

18       11.     Plaintiffs therefore demand judgment against Defendants and request, among other

19   things, compensatory damages, statutory damages, punitive damages, attorneys' fees, costs and all

20   other available remedies and damages allowed by law.

21                                    **PLAINTIFFS**

22       12.     At all relevant times, Plaintiff MELISSA MORRISON was and has been a resident

23   and citizen of the State of California.

24       13.     Plaintiff MELISSA MORRISON was diagnosed with Interstitial Cystitis in or about

25   2012.

26       14.     Plaintiff MELISSA MORRISON took Elmiron as prescribed by her physicians

27   from approximately 2012 through approximately 2018.  Specifically, from approximately 2013 to

28   2018, the physician that prescribed Elmiron for use by Plaintiff MELISSA MORRISON was

1    Defendant C. LOWELL PARSONS.

2            15.    At all relevant times, Plaintiff KELLIE VALENCIA was and has been a resident

3    and citizen of the State of California.

4            16.    Plaintiff KELLIE VALENCIA was diagnosed with Interstitial Cystitis in or about

5    2010.

6            17.    Plaintiff KELLIE VALENCIA took Elmiron as prescribed by her physician from

7    approximately 2010 through 2018.

8            18.    At all relevant times, Plaintiff KARIE KUEHL was and has been a resident and

9    citizen of the State of California.

10           19.    Plaintiff KARIE KUEHL was diagnosed with Interstitial Cystitis in or about 2014.

11           20.    Plaintiff KARIE KUEHL took Elmiron as prescribed by her physician from

12   approximately 2014 to at least 2020.

13           21.    Plaintiffs were given no warning by Defendants of the serious risk of vision

14   threatening retinal and macular changes, including vision loss and maculopathy posed by Elmiron.

15           22.    Plaintiffs were given no warning by their physicians of the serious risk of vision

16   threatening retinal and macular changes, including vision loss and maculopathy posed by Elmiron.

17           23.    Plaintiffs had no knowledge of the serious risk of vision threatening retinal and

18   macular changes, including vision loss and maculopathy posed by Elmiron.

19           24.    Plaintiffs' treating eye physicians were given no warning by Defendants of the

20   serious risk of vision threatening retinal and macular changes, including vision loss and

21   maculopathy posed by Elmiron.

22           25.    Plaintiffs were given no warning by Defendants of the need for ophthalmologic

23   monitoring before taking, while taking, and after discontinuing Elmiron.

24           26.    Plaintiffs were given no warning by their physicians of the need for ophthalmologic

25   monitoring before taking, while taking, and after discontinuing Elmiron.

26           27.    Plaintiffs had no knowledge of the need for ophthalmologic monitoring before

27   taking, while taking, and after discontinuing Elmiron.

28           28.    As a result of Plaintiffs' use of Elmiron, Plaintiffs now suffer from severe physical

4

COMPLAINT

1    and emotional injuries as well as severe symptoms including but not limited to the following:

2    Blurred vision, difficulty adapting to dim lighting or darkness, difficulty seeing at night, and

3    sensitivity to light.

4        29.    Further, retinal and vision changes may continue to progress even though Plaintiffs

5    are no longer taking Elmiron.

6    **DEFENDANTS**

7        30.    Upon information and belief IVAX LLC f/k/a IVAX Corporation ("IVAX")

8    acquired Baker Norton Pharmaceuticals, Inc. f/k/a Baker Cummins Pharmaceuticals, Inc. ("Baker

9    Norton") in the late 1980s. Baker Norton became a wholly owned subsidiary of IVAX.

10       31.    In June 1991, Baker Norton submitted the New Drug Application (NDA) [1] for

11   Elmiron to the U.S. Food and Drug Administration (FDA) and was the named sponsor on the

12   approval of Elmiron by the FDA.

13       32.    Baker Norton held the NDA for Elmiron from the date of approval, September 26,

14   1996, until approximately September 1997.

15       33.    In September 1997, Baker Norton, a subsidiary of IVAX, licensed the rights to

16   Elmiron in the United States and Canada to ALZA Pharmaceuticals, a division of Defendant **ALZA**

17   **CORPORATION**, for $75 Million in up-front payments.

18       34.    Defendant **ALZA CORPORATION** ("ALZA") is a corporation organized under

19   Delaware law. At all times relevant and material hereto, **ALZA** was a pharmaceutical company

20   involved in the manufacturing, research, development, marketing, distribution, sale, and release for

21   use to the general public of pharmaceuticals, including Elmiron, throughout the United States,

22   including in California.

23

24

25

---

26   [1] The holder of the NDA is the party that controls the patents associated with an FDA approved
27   drug, giving them the ability to, among other things, market and sell the subject drug. The NDA
     holder also has the ability and responsibility to update the product label, no matter where the
     update in the label is needed, to ensure that it warns of dangerous adverse events associated with
28   its drug.

35.     Defendant **ALZA** held the NDA for Elmiron from approximately April 1998 until August 2002.

36.     In March of 2001, Defendant **JOHNSON & JOHNSON** announced a merger acquiring **ALZA CORPORATION** and this acquisition was completed in June 2001.

37.     More specifically, on June 22, 2001, **JOHNSON & JOHNSON** acquired licensing rights to Elmiron upon when a wholly owned subsidiary of **JOHNSON & JOHNSON** merged with and into **ALZA**, in a $10.5 billion stock-for-stock transaction.

38.     Defendant **JOHNSON & JOHNSON** is a corporation organized under New Jersey law with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

39.     Upon information and belief, **JANSSEN RESEARCH & DEVELOPMENT LLC, f/k/a Johnson & Johnson Research & Development, LLC ("JANSSEN R&D")** was also created in 2001 with the merger of various research organizations, including but not limited to McNeil Pharmaceuticals and Janssen Research Foundation.

40.     Defendant **JANSSEN R & D** is a limited liability company organized under the laws of New Jersey with its principal place of business at 920 US Highway 202, Raritan, New Jersey 08869-1420.

41.     **JANSSEN R&D**'s sole member is Centocor Research & Development, Inc. ("Centocor"), a Pennsylvania corporation with its principal place of business at 800 Ridgeview Dr., Horsham, Pennsylvania 19044.  Upon information and belief, **JOHNSON & JOHNSON** maintains a controlling interest in Centocor.

42.     At all times relevant and material hereto, **JANSSEN R&D** was, and still is, a pharmaceutical company involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Elmiron, in throughout the United States, including in California.

43.     **JANSSEN R&D** held the NDA for Elmiron from approximately August 2002 until around July 2004.

44.     Upon information and belief, **ORTHO-MCNEIL PHARMACEUTICAL, LLC**

1  a/k/a **ORTHO-MCNEIL PHARMACEUTICAL, INC.** became the holder of the NDA for

2  Elmiron in or about July 2004 until August 2008.

3      45.  Upon information and belief, Defendant **ORTHO-MCNEIL**

4  **PHARMACEUTICAL, LLC a/k/a ORTHO-MCNEIL PHARMACEUTICAL, INC.**

5  **("ORTHO PHARMA")** became known as Ortho-McNeil-Janssen Pharmaceuticals, Inc. f/k/a

6  Ortho-McNeil-Janssen Pharmaceutical Inc. which is **n/k/a JANSSEN PHARMACEUTICALS,**

7  **INC. ("JANSSEN PHARMA")**, all wholly owned subsidiaries of Defendant **JOHNSON &**

8  **JOHNSON**.

9      46.  Defendant **ORTHO PHARMA** is a corporation organized under Delaware law

10  with its principal place of business at 1000 US Highway 202, Raritan, New Jersey 08869.

11      47.  **ORTHO PHARMA** marketed, co-marketed, sold and distributed the defective

12  product, Elmiron, through its division, Ortho Women's Health and Urology.

13      48.  At all times relevant and material hereto, **ORTHO PHARMA** was, and still is, a

14  pharmaceutical company involved in the manufacturing, research, development, marketing,

15  distribution, sale, and release for use to the general public of pharmaceuticals, including Elmiron,

16  in throughout the United States, including in California.

17      49.  Upon information and belief, Defendant **JANSSEN PHARMA** is the current NDA

18  holder and has held the U.S. Food and Drug Administration NDA for Elmiron since approximately

19  August 2008.

20      50.  Defendant **JANSSEN PHARMACEUTICALS, INC., f/k/a Ortho-McNeil-**

21  **Janssen Pharmaceuticals, Inc., f/k/a Janssen Pharmaceutica Inc., ("JANSSEN PHARMA")** is

22  a corporation organized under Pennsylvania law with its principal place of business at 1125 Trenton-

23  Harbourton Road, Titusville, New Jersey 08560.

24      51.  At all times relevant and material hereto, **JANSSEN PHARMA** was, and still is, a

25  pharmaceutical company involved in the manufacturing, research, development, marketing,

26  distribution, sale, and release for use to the general public of pharmaceuticals, including Elmiron,

27  in throughout the United States, including in California.

28      52.  Upon information and belief, Defendant **JANSSEN ORTHO, LLC ("JANSSEN**

7
COMPLAINT

1   **ORTHO"**) is another subsidiary of defendant **JOHNSON & JOHNSON** involved in the

2   manufacturing, research, development, marketing, distribution, sale, and release for use to the

3   general public of pharmaceuticals, including Elmiron throughout the United States, including in

4   California.

5         53.   Defendant **JANSSEN ORTHO** is a limited liability company organized under

6   Delaware law with its principal place of business in Gurabo, Puerto Rico.

7         54.   **JANSSEN ORTHO**'s sole member is OMJ PR Holdings, a corporation

8   incorporated in Ireland with a principal place of business in Puerto Rico.  Upon information and

9   belief, **JOHNSON & JOHNSON** maintains a controlling interest in OMJ PR Holdings.

10        55.   Upon information and belief, Defendants **JANSSEN PHARMA, ORTHO**

11  **PHARMA, JANSSEN R&D, JANSSEN ORTHO** and **ALZA** are and have been wholly owned

12  subsidiaries of Defendant **JOHNSON & JOHNSON**.

13        56.   **JOHNSON & JOHNSON** and its "family of companies" do business in California

14  and other states by, among other things, designing, developing, testing, manufacturing, labeling,

15  packaging, distributing, marketing, selling and/or profiting from Elmiron throughout the United

16  States, including in California.

17        57.   Upon information and belief, TEVA PHARMACEUTICAL INDUSTRIES LTD.,

18  the Israeli parent company of the TEVA brand pharmaceutical companies, acquired IVAX and

19  officially merged on February 1, 2006.

20        58.   IVAX continued to maintain royalties from Elmiron sales through at least 2006

21  although the rights had previously been licensed to **ALZA** which was now a subsidiary of Defendant

22  **JOHNSON & JOHNSON**.

23        59.   Upon information and belief, **TEVA BRANDED PHARMACEUTICAL**

24  **PRODUCTS R&D, INC., f/k/a TEVA Global Respiratory Research, LLC, ("TEVA")** and

25  **TEVA PHARMACEUTICALS USA, INC.** are and were wholly owned subsidiaries of TEVA

26  PHARMACEUTICAL INDUSTRIES LTD., the Israeli parent company.

27        60.   Therefore, IVAX LLC f/k/a IVAX CORPORATION was and is a wholly owned

28  subsidiary of the Teva branded pharmaceutical companies.

61. **Defendant TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a TEVA Global Respiratory Research, LLC, ("TEVA")** is a Delaware corporation with a principal place of business at 41 Moores Road, Malvern, Pennsylvania 19355.

62. At all times relevant and material hereto, **TEVA** was, and still is, a pharmaceutical company involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Elmiron, throughout the United States, including in California.

63. Defendant **TEVA PHARMACEUTICALS USA, INC. ("TEVA PHARMACEUTICALS USA")** is a corporation organized under Delaware law with its principal place of business 400 Interpace Parkway, Parsippany, NJ 07054.

64. At all times relevant and material hereto, **TEVA PHARMACEUTICALS USA** was, and still is, a pharmaceutical company involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Elmiron, throughout the United States, including in California.

65. Elmiron was and is a Registered Trademark of Defendant **TEVA** under license to Defendant **JANSSEN PHARMA**.

66. Defendant **C. LOWELL PARSONS** is, and at all relevant times was, a medical doctor (a urologist) licensed to practice medicine in the State of California. Dr. Parsons is, and at all relevant times was, practicing medicine in the San Diego area and a resident of San Diego County, California. From approximately 2013 through approximately 2018, Dr. Parsons was the urologist for Plaintiff MELISSA MORRISON and prescribed Elmiron to Plaintiff MELISSA MORRISON during that time period.

67. Defendants, both individually and jointly, engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Elmiron and continue to control the Elmiron NDA.

68. The true names and/or capacities, whether individual, corporate, partnership, associate, governmental, or otherwise, of Defendants DOES 1 through 20, inclusive, and each of them, are unknown to Plaintiffs at this time, who therefore sues said Defendants by such fictitious

1  names. Plaintiffs are informed and believe, and thereon allege, that each Defendant designated

2  herein as a DOE caused injuries and damages proximately thereby to Plaintiffs as hereinafter allege;

3  and that each DOE defendant is liable to Plaintiffs for the acts and omissions alleged herein below,

4  and the resulting injuries to Plaintiffs, and damages sustained by Plaintiffs. Plaintiffs will amend

5  this Complaint to allege the true names and capacities of said DOE Defendants when that same is

6  ascertained.

7                                      **JURISDICTION & VENUE**

8          69.     This Court has jurisdiction over Defendants because they have engaged in the

9  business of designing, developing, manufacturing, testing, packaging, promoting, marketing,

10  distributing, labeling, prescribing and/or selling Elmiron to Plaintiffs in California.

11         70.     Venue is proper in this forum because the Defendants engage in the above-described

12  business activities in San Diego County and a substantial portion of the practices, events and

13  omissions complained of herein occurred and/or had an effect in San Diego County, where at least

14  one of the Plaintiffs resides.

15                                     **FACTUAL ALLEGATIONS**

16      **A.    History of Elmiron**

17         71.     Elmiron, also known as Pentosan Polysulfate Sodium (PPS), is an oral heparinoid

18  derived from beech tree bark. It is a macromolecule resembling glycosaminoglycans (GAGs) and

19  was initially used in the 1950's as a blood thinner – similar to Heparin.

20         72.     Elmiron was the first and only oral drug approved by the FDA specifically for the

21  treatment of patients with Interstitial Cystitis.

22         73.     However, Elmiron is not the only therapy available to physicians and patients to treat

23  Interstitial Cystitis.

24         74.     Interstitial Cystitis is a diagnosis that applies to patients with chronic bladder pain

25  in the absence of other explanatory etiologies (or causes). The symptoms associated with Interstitial

26  Cystitis range from discomfort to debilitating pain.

27         75.     Under the Interstitial Cystitis treatment guidelines established by the American

28  Urological Association (AUA), Elmiron is not a first-line treatment.  Rather, Elmiron is one of ten

1  suggested second-line treatments, including three other oral medications: amitriptyline, cimetidine

2  and hydroxyzine. The guidelines further include numerous third, fourth, fifth and sixth-line

3  treatments. According to the AUA, "first-line treatments" should be suggested to all patients and

4  "sixth-line treatments" should be reserved for the most severe cases, with the remaining treatment

5  options falling in-between.

6      76.    Defendants marketed Elmiron as "The Only Oral Medication Approved to Treat the

7  Bladder Pain or Discomfort of Interstitial Cystitis (IC)."[2] However, while Elmiron was the only oral

8  medication approved by the FDA specifically for the purpose of treating Interstitial Cystitis at all

9  relevant times herein, it is not the only oral medication approved by the FDA which can be used to

10  treat Interstitial Cystitis and it is not the only Interstitial Cystitis treatment.

11      77.    On August 7, 1985, Elmiron was designated an orphan drug by the FDA. At that

12  time, non-party Medical Marketing Specialists, located in Boonton, New Jersey, was the owner of

13  Elmiron. The orphan drug designation is a special status granted under the Orphan Drug Act

14  ("ODA") to a drug used to treat a rare disease or condition upon request of a sponsor. For a drug to

15  qualify for orphan designation, both the drug and the disease or condition must meet certain criteria

16  specified in the ODA and FDA's implementing regulations (21 CFR Part 316). Orphan designation

17  qualifies the sponsor of the drug for various development incentives provided by the ODA, including

18  tax credits for qualified clinical testing. However, the granting of an orphan designation request does

19  not alter the standard regulatory requirements and process for obtaining marketing approval. Safety

20  and effectiveness of a drug must be established through adequate and well-controlled studies.

21      78.    In 1986, Elmiron was made available for compassionate use. Compassionate use is

22  a potential pathway for a patient with an immediately life-threatening condition or serious disease

23  or condition to gain access to an investigational medical product (drug, biologic, medical device, or

24  combination product) for treatment outside of clinical trials when no comparable or satisfactory

25  alternative therapy options are available.

26

27  _____

28  [2] https://www.orthoelmiron.com/patient/about-elmiron.

79.     The original New Drug Application ("NDA") for Elmiron was submitted on June 11, 1991, five (5) years after it was made available for compassionate use by Baker Cummins Pharmaceuticals, Inc., now Baker Norton, which at the time was a subsidiary of IVAX. Since this time, IVAX was acquired by TEVA and is one of its wholly owned subsidiaries.

80.     On February 18, 1992, FDA Division Director Wiley A. Chambers, MD issued his review of the Elmiron NDA. In his review, Dr. Chambers indicated the NDA was not recommended for approval, citing several very serious flaws with the clinical trials purported to support approval of the drug. Specifically, Dr. Chambers stated:

> The application as submitted lacks substantial evidence consisting of adequate and well-controlled investigations, as defined in 21 CFR 314.126 that the drug product will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in its proposed labeling. Specifically, the analysis of the results of the submitted studies are not adequate to assess the effects of the drug.

He further stated:

> The purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences. Based on the analyses submitted to date for studies E-001 and E-002, there appears to be significant investigator interaction. The results obtained by the first investigator listed in each study are significantly different than the results obtained by each of the other investigators in the studies. In the absence of an adequate explanation for these differences, studies E-001 and E-002 cannot be considered to be adequate and well-controlled. It is recommended that an additional clinical investigation utilizing investigators not included in previous studies be conducted and submitted as part of any resubmission of this application.

81.     The investigators, Dr. Philip Hanno and Dr. C. Lowell Parsons (himself now a Defendant in this action), referenced in Dr. Chambers' review were noted as having "significantly different" results compared to all of the other investigators.

82.     Dr. Parsons' results in study E-002 were particularly concerning to the FDA reviewers. Specifically, Dr. Parsons found that 10/15 or 66.7% of his patients treated with Elmiron described their bladder pain as "better." Interestingly, no other investigator in that study had more than 40% of patients fit into this category and collectively, the other six investigators combined reported that only 23% of patients described their bladder pain as "better." As noted by FDA reviewer Dr. John Kenealy:

[I]n each of the studies herein presented, elimination of the results from one of the centers all but destroys the statistical significance of the results of that study. The medical reviewer has indicated that one of the two investigators is known to have a financial interest in this drug. Because of the strong influence of these centers on the outcome, Scientific Investigations has been requested to audit the records of these centers for these studies.

FDA reviewer Dr. Paul Waymack also stated:

[I]t should be noted that when reviewing the data, it was determined that if the data from a single investigator (the champion of this therapy) was removed from the study, not only was statistical significance lost, but even the trend towards benefit was lost.

83.    Both reviewers were referring to Dr. Parsons, who had both a financial interest in Elmiron, as well as connections with the sponsor at the time, Baker Norton.

84.    Indeed, after Elmiron was approved, Dr. Parsons gave numerous lectures and presentations touting Elmiron as "an amazing breakthrough" to treat Interstitial Cystitis.

85.    Upon information and belief, Dr. Parsons received and continues to receive from the Defendants, royalty payments from the sale of Elmiron.

86.    Due in part to the serious flaws in the clinical studies performed by Dr. Parsons and other concerns expressed by the FDA, on January 27, 1993, the FDA sent a letter to Baker Norton indicating the NDA for Elmiron was not approvable. The letter included the following statement as one of the reasons the NDA was denied:

One purpose of conducting clinical investigations of a drug is to distinguish the effect of a drug from other influences. Based on the analyses submitted for studies E-001 and E-002, there appears to be significant investigator interaction. The results obtained by the first investigator listed in each study are significantly different than the results obtained by each of the other investigators in the studies. In the absence of an adequate explanation for these differences, studies E-001 and E-002 cannot be considered to be adequate and well-controlled. We recommend that an additional clinical investigation utilizing investigators not included in previous studies be conducted and submitted as part of any amending of this application.

We recommend that you consider carrying out an additional study to demonstrate effectiveness of the drug.

87.    On March 19, 1993, a meeting was held between the FDA and Baker Norton, during which the FDA again requested Baker Norton perform an additional clinical study to support the efficacy of Elmiron. During the meeting, the parameters of the recommended study were discussed in detail. However, during this meeting, FDA also agreed that Baker Norton could submit additional

1  analyses to support their position that the existing data was adequate. This included further analysis

2  of clinical trials E-001 and E-002, along with an analysis of the compassionate use experience. The

3  re-analysis of the clinical trials was submitted to FDA on July 7, 1993.

4       88.    After receipt of the new analysis submitted by Baker Norton, FDA issued a memo

5  again declaring the NDA for Elmiron remained not approvable, citing a lack of independence by a

6  clinical investigator, failure to meet the level of statistical significance required and a failure of the

7  case report forms to support the scale used for analysis. FDA again requested that a new clinical trial

8  be conducted. At this time, the compassionate use data had not yet been provided to FDA.

9       89.    On July 20, 1993, Baker Norton submitted a brief study protocol for a proposed

10  urinary concentration-controlled trial of Elmiron. Upon information and belief this study was not

11  conducted prior to approval.

12       90.    On August 29, 1994, Dr. Waymack sent a correspondence to Division Director

13  Patricia Love expressing further serious concerns about studies E-001 and E-002, stating:

14      They have reanalyzed the data from the E-002 trial, after excluding all the data
    from Dr. Parsons. When this was done, the lowest p value obtained was only .107,

15      which was for the Overall Improvement (Investigator Impression). This raises a
    number of possible explanations for the significant p values obtained from the

16      studies, other than the drug having an effect. These would include a different
    patient population at the site of Dr. Parsons investigations, a loss of blinding, some

17      other form of bias, or a random statistical event.

18       91.    On October 28, 1994, FDA issued another letter declining to approve Baker

19  Norton's NDA for Elmiron. The letter indicated that study E-001 did not provide adequate evidence

20  of effectiveness and that study E-002 provided only "some" evidence of effectiveness (as indicated

21  above, the results of study E-002 were disproportionately affected by Dr. Parson's data). Thus, FDA

22  requested that Baker Norton perform an additional adequate and well-controlled clinical study

23  designed to show effectiveness and safety. FDA suggested that if the study was clearly positive and

24  otherwise acceptable it, along with study E-002, would provide sufficient evidence for approval.

25       92.    On February 16, 1995, a meeting was held between FDA and Baker Norton. During

26  this meeting, FDA again reiterated the need for an additional clinical trial and Baker Norton

27  continued to resist, arguing for the validity of the two trials already conducted. FDA was not

28  convinced, stating:

14
COMPLAINT

We indicated that we need replication of an adequate study. This is in part needed in order to show that other physicians can safely use the product. So far, their data shows that one physician can use Elmiron; the results from the other physicians do not show improvement. The sponsor showed a slice with pooled data from all investigators in order to support their position. This slide confirmed our point that the data is driven by one physician (Parsons).

93.     Baker Norton continued to push back against conducting an additional trial and instead suggested that the compassionate use data would be sufficient to show the product worked. FDA noted that such an analysis would be the "third reassessment of old data that was twice deemed inadequate."

94.     On August 31, 1995, Baker Norton submitted its analysis of the compassionate use experience.

95.     On March 1, 1996, despite Baker Norton's refusal to conduct an additional clinical trial to demonstrate the effectiveness of Elmiron, for some yet unknown reason, FDA approved the NDA, giving Baker Norton the right to market Elmiron in the United States. This approval was based on study E-002, previously deemed inadequate and a compassionate use experience analysis, also previously deemed inadequate.

96.     In September 1997, ALZA acquired rights to Elmiron from Baker Norton, which at this point in time was still owned by IVAX.  Baker Norton/IVAX sold the rights to Elmiron to ALZA for $75 million up front and continued to receive milestone and royalty payments thereafter. Defendant, ALZA held the NDA for Elmiron from approximately April 1998 to August 2002.

97.     More specifically, on June 22, 2001, JOHNSON & JOHNSON acquired licensing rights to Elmiron upon when a wholly owned subsidiary of JOHNSON & JOHNSON merged with and into ALZA, in a $10.5 billion stock-for-stock transaction.

98.     JANSSEN R&D became the NDA holder for Elmiron from approximately August 2002 to July 2004.

99.     ORTHO PHARMA then held the NDA for Elmiron from approximately July 2004 until August 2008.

100.    JANSSEN PHARMA is the current NDA holder for Elmiron and has held the NDA since approximately August 2008.

**B.**   **The Dangers of Elmiron**

101.   Despite numerous studies and other information in the possession of the Defendants providing clear evidence of the dangers of Elmiron, Defendants failed to adequately investigate the threat that Elmiron poses to patients' vision.

102.   Despite numerous studies and other information in the possession of the Defendants providing clear evidence of the dangers of Elmiron, Defendants failed to warn in any way physicians that were not otherwise privy to the information of the risk that their patients could suffer retinal and macular changes including vision impairment and/or vision loss prior to June 16, 2020.

103.   As more fully stated herein, the updated Warnings section and labeling published on or about June 16, 2020 were inadequate.

104.   Despite numerous studies and other information in the possession of the Defendants providing clear evidence of the dangers of Elmiron, Defendants failed to warn patients in any way of the risk that they could suffer retinal and macular changes including vision impairment and/or vision loss prior to June 16, 2020.

105.   Clear evidence that Elmiron use is associated with ocular damage, including maculopathy, dates back to the initial evaluations of compassionate use experience conducted in the late 1980s and early 1990s, and submitted in support of the NDA. Indeed, during this analysis, the following adverse reactions were noted: atrophic macular degeneration, retinal disorder, retinal artery occlusion, optic atrophy, optic neuritis, eye hemorrhage and eye disorder. Defendants relied upon this study when seeking FDA approval and therefore had direct knowledge of the adverse effects.[3]

106.   The reported adverse effects included the following descriptions:[4]

> a.) Blurred Vision. Left Central Optic Vein Occlusion: A 32 year old white female without a prior history of eye trauma, hypertension, diabetes or previous significant ophthalmologic history complained of experiencing blurred vision.

---

[3] A Statistical and Medical Review of an Amendment to the New Drug Application for Elmiron® (Pentosan Polysulfate), NDA #20193, Appendix D (January 1996).
[4] Id.

b.) "Filmy Sensation Over Left Eye" Possible Left Optic Neuritis: A 21 year old white female without any history of ophthalmological problems, head trauma, diabetes, or any previous neurological symptoms experienced a "filmy sensation over the left eye."

107.   Available medical research also identified as early as 1991, that PPS inhibits regrowth and proliferation of retinal pigment epithelial (RPE) cells,[5] and could thereby impair an important physiological pathway for retinal health.

108.   In fact, by 1992 PPS was also in Phase I trials for certain cancer treatments because of its "potent inhibition of cell motility," which further corroborates the role of PPS inhibiting cell regrowth and proliferation.

109.   There is no indication that any of the Defendants ever advised the FDA that available medical research from as early as 1991 identified PPS effects on the fibroblast growth factors (FGF) as well as other growth factors, inhibits regrowth and proliferation of retinal pigment epithelial (RPE) cells, and could thereby impair an important physiological pathway for retinal health.

110.   There is no indication that any of the Defendants ever advised the FDA that the medical research continued to build, since 1991, as to the effects of Elmiron on the fibroblast growth factors (FGF) as well as other growth factors, that inhibit regrowth and proliferation of retinal pigment epithelial (RPE) cells and could thereby impair an important physiological pathway for retinal health.

111.   Almost immediately after the FDA approved Elmiron, patients and doctors began reporting serious complications relating to eye and vision problems in patients taking Elmiron.[6]

112.   Nearly 150 cases of eye disorders were reported to the FDA as adverse effects of Elmiron, ranging from blurred vision to maculopathy and blindness. Other reported symptoms

---

[5] Katrinka H. Leschey, John Hines, Jeff H. Singer, Sean F. Hackett and Peter A. Campochiaro, *Inhibition of Growth Factor Effects in Retinal Pigment Epithelial Cells*, 32 INVESTIGATIVE OPHTHALMOLOGY & VISUAL SCIENCE 1770-1778 (1991).

[6] According to the FDA Adverse Events Reporting System (FAERS) Public Dashboard, eight patients taking Elmiron reported serious adverse effects to their vision in the 1997 calendar year. https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis

1  include visual impairment, halo vision and reduced visual acuity.[7]

2      113.    In 2018, researchers from the Emory Eye Center published their concerns about the

3  presentation of a unique eye disease they were seeing in patients taking Elmiron in the Journal of

4  Ophthalmology.

5      114.    The researchers also summarized their findings in a letter to the editor of the Journal

6  of Urology:

> We wish to alert readers to a concerning new observation of vision threatening retinal changes associated with long-term exposure to [Elmiron]. We recently reported our findings of retinal pigmentary changes in six patients undergoing long-term therapy with [Elmiron]. These patients primarily described difficulty reading and/or trouble adjusting to dim lighting. Each patient had received a standard dosage of [Elmiron], ranging from 200 to 400 mg daily, for a median duration of 15.5 years. . . . Examination findings in patients with this condition are suggestive of injury to the retina and the underlying retinal pigment epithelium. . . . After extensive investigations, which included molecular testing for hereditary retinal disease, we found these cases to resemble no other retinal disease.[8]

13      115.    The study, "Pigmentary Maculopathy Associated with Chronic Exposure to

14  [Elmiron]," focused on six women with Interstitial Cystitis who presented to the Emory clinic

15  between May 2015 and October 2017 with pigmentary maculopathy.[9]

16      116.    Maculopathy is a general term referring to any pathological condition that affects

17  the macula, the central portion of the retina upon which visual acuity and sensitivity depend.

18      117.    Most of these patients had difficulty reading and difficulty seeing in darkness. Two

19  patients experienced a generalized dimming of their vision as the first symptom. Two others had

20  difficulty with near vision: one had paracentral scotomas (vision loss) in part of the eye, while the

21  other had metamorphopsia (distorted vision where straight lines become wavy).

22      118.    All six patients underwent rigorous diagnostic imaging and DNA testing to

---

[7] To date, at least 2,395 patients have reported "serious" adverse events of which approximately 1,794 "serious eye-related" adverse events with regard to their vision. https://fis.fda.gov/sense/app/95239e26-e0be-42d9-a960-9a5f7f1c25ee/sheet/45beeb74-30ab-46be-8267-5756582633b4/state/analysis

[8] William A. Pearce, Adam M. Hanif, and Nieraj Jain, Letter to the Editor Re: *FDA BRUDAC 2018 Criteria for Interstitial Cystitis/Bladder Pain Syndrome Clinical Trials*, 200 UROLOGY 1122 (2018).

[9] William A. Pearce, Rui Chen, and Nieraj Jain, *Pigmentary Maculopathy Associated with Chronic Exposure to Pentosan Polysulfate Sodium*, 125 OPHTHALMOLOGY 1793–1802 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29801663

1  determine if they had any genes associated with hereditary retinal loss. None had a family history

2  of retinal disease or the discovery of any pathogenic process.

3      119.     The common link was the use of Elmiron.

4      120.     Examinations of their eyes showed clear changes: "Nearly all eyes (10 eyes of 5

5  patients) showed subtle parafoveal pigmented deposits at the level of the retinal pigment epithelium

6  (RPE)."[10] All eyes "showed subtle vitelliform deposits that increased in number and extended

7  beyond the major arcade of vessels in cases judged to be more severe. Four eyes of 2 patients showed

8  RPE atrophy that was noted to increase in area and encroach on the central fovea over time."[11]

9  Retinal imaging also found clear diseased regions, atrophy, or both.[12]

10      121.     The youngest patient in the study was 37 years old. Diagnosed with Interstitial

11  Cystitis at the age of 23 and on a steady dosage of Elmiron, she began showing visual symptoms

12  (difficulty with near vision and difficulty reading) at the age of 30 — just six years after she was

13  diagnosed. She had the most severe damage in the study with deep scotomas of both eyes.[13]

14      122.     The authors expressed concern that "the region of affected tissue may expand

15  centrifugally over time."[14]

16      123.     They concluded that "[c]linicians should be aware of this condition because it can

17  be mistaken for other well-known macular disorders such as pattern dystrophy and age-related

18  macular degeneration."[15]

19      124.     They also encouraged "drug cessation in affected patients," and "recommend that

20  any patient with suggestive visual symptoms undergo a comprehensive ophthalmic examination."[16]

21      125.     Interstitial Cystitis experts Robert Moldwin and Curtis Nickel responded to the

22  Emory findings with extreme concern: "It is quite unlikely that urologists treating patients with [IC]

23

24  [10] *Id.* at 1798.
25  [11] *Id.*
   [12] *Id.*
26  [13] *Id.* at 1795, Table 2.
   [14] *Id.* at 1800.
27  [15] *Id.* at 1801.
28  [16] William A. Pearce, Adam M. Hanif and Nieraj Jain, Letter to the Editor Re: *FDA BRUDAC 2018 Criteria for Interstitial Cystitis/Bladder Pain Syndrome Clinical Trials*, 200 UROLOGY 1122 (2018).

1  ever would have made this association . . . yet the implications are either frightening if our treatment

2  is causing this condition or instructive if this condition is a previously unknown manifestation of

3  [IC]."[17]

4      126.    In a letter published online on April 24, 2019, five doctors from the Cleveland

5  Clinic Cole Eye Institute responded to Pearce et al.: *Pigmentary maculopathy associated with*

6  *chronic exposure to pentosan polysulfate sodium* 125 OPHTHALMOLOGY 1793–1802 (2018).

7  The doctors suggested "…that long-term antagonism of FGF signaling in human retinas by PPS has

8  the potential to be an underlying mechanism of toxicity." They further indicated that "[o]ne could

9  surmise that, without the appropriate FGF signaling, and thereby activity of support cells such as

10  Müller glia, long-term accumulation of damage without repair could be the culprit."[18]

11      127.    At the American Urology Association Annual Meeting in May 2019, the Emory

12  team submitted another study of ten Interstitial Cystitis patients who had taken Elmiron and

13  experienced macular disease.[19]

14      128.    The patients had a median age of 59 years (range 38–68) and median time since

15  Interstitial Cystitis diagnosis of 19 years (range 4–40). The most commonly reported symptoms

16  were difficulty reading and difficulty adapting to dim lighting.

17      129.    Eye examinations showed symmetric pigmentary changes in the retina. Retinal

18  imaging demonstrated that the abnormalities were primarily in the retinal pigment epithelium. They

19  noted that their clinic had seen 156 patients with Interstitial Cystitis who did not have any Elmiron

20  exposure—and these patients showed no pigmentary maculopathy.

21      130.    The Emory team concluded that structural changes of the retina were occurring in

22  patients taking Elmiron and they were unclear if stopping the medication will alter the course of the

---

24  [17] J.C. Nickel and R. Moldwin, Reply to Letter to the Editor Re: *FDA BRUDAC 2018 Criteria for Interstitial*

25  *Cystitis/Bladder Pain Syndrome Clinical Trials*, 200 UROLOGY 1122, 1123 (2018).
   [18] Tyler Greenlee, Grant Hom, Thais Conti, Amy S. Babiuch, and Rishi Singh, Letter to the Editor Re: Pearce et al.:

26  *Pigmentary maculopathy associated with chronic exposure to pentosan polysulfate sodium* (Ophthalmology. 2018; 125:1793-1802) (Published online April 24, 2019).

27  [19] Jenelle Foote, Adam Hanif, and Nieraj Jain, *Chronic Exposure to Pentosan Polysulfate Sodium is Associated with Retinal Pigmentary Changes and Vision Loss*, 201 UROLOGY e688 (2019),

28  https://www.auajournals.org/doi/10.1097/01.JU.0000556315.46806.ca

1  damage. They encouraged affected patients to discontinue the use of medications and to undergo

2  comprehensive ophthalmic examinations.

3       131.   On June 27, 2019, The European Medicines Agency (EMA),   a decentralized

4  agency of the European Union (EU) responsible for the scientific evaluation, supervision and safety

5  monitoring of medicines in the EU, through its Committee for Medicinal Products for Human Use

6  (CHMP), published a report entitled, "Scientific conclusions and grounds for the variation to the

7  terms of the marketing authorisation(s)," apparently reviewing data from the period June 02, 2018

8  through December 01, 2018 stating in relevant part:

> Taking into account the PRAC Assessment Report on the PSUR(s) for pentosan
> polysulfate sodium (for centrally authorised product), the scientific conclusions of
> CHMP are as follows:
>
> In literature, pigmentary maculopathy has been reported rarely, with pentosan
> polysulfate sodium, especially after long-term use. Visual symptoms might include
> complaints of reading difficulty and prolonged adjustment to low or reduced light
> environments. After extensive investigations, which included molecular testing for
> hereditary retinal disease, the authors of the study found these cases to resemble no
> other known retinal disease. Additionally, from the EudraVigilance database, at
> least one case describes similar findings on macula. There are a further 10 cases
> under SOC "eye disorders", including visual impairment, blindness, retinopathy or
> optic neuritis.
>
> Pending further investigation, it remains unclear whether drug cessation will halt or
> alter the course of the retinal disease.
>
> Although majority of the reports available in literature describe a minimum
> exposure to PPS of 12 years and a higher dosage than recommended in the SmPC,
> 1 case occurred with the recommended daily dose of 300 mg (Pierce et al).
> Moreover, 3 cases retrieved from Vigilyse included also the recommended dosage
> of 300 mg/day. Regarding the time of exposure to PPS, Foote et al article includes
> 1 patient exposed during 27 months and a case from Vigilyse describes an exposure
> of less than 2 years. Therefore, based on the available data it cannot be concluded
> that the pathophysiologic changes cannot be detected earlier (perhaps in an
> asymptomatic, reversible stage), even with the recommended daily dosage of 300
> mg.
>
> In the light of this information, the PRAC recommended an update of the product
> information to warn about this risk and recommend regular ophthalmic
> examinations for early detection of pigmentary maculopathy, particularly in
> patients taking pentosan polysulfate sodium long-term.
>
> Additionally, the PRAC recommended the distribution of a DHPC, since even if
> rare, it is a potentially irreversible, serious condition, which might not be easily

1    recognized by the urology community. [20]

2    132.    The CHMP also recommended a Direct Healthcare Professional Communication,

3    the equivalent of what is often referred to as a "Dear Doctor Letter" in the U.S., due to the fact that

4    the condition at issue is "a potentially irreversible, serious condition, which might not be easily

5    recognized by the urology community."[21]

6    133.    Shortly after the recommendation by the CHMP was issued, the product labeling in

7    the EU for Elmiron was updated to specifically warn that "[a]ll patients should have regular

8    ophthalmic examinations for early detection of pigmentary maculopathy, particularly those with

9    long term use of PPS. In such situations, treatment cessation should be considered."[22]

10    134.    In July 2019, the Emory team published a study in the Review of Ophthalmology.[23]

11    135.    "Our subsequent investigations," the team wrote, "demonstrated that this unique

12    maculopathy is strongly associated with chronic [Elmiron] exposure, not Interstitial Cystitis itself

13    or its other therapies. In fact, this characteristic maculopathy has, to date, been exclusively

14    diagnosed in patients reporting prior [Elmiron] exposure."[24]

15    136.    The team further observed that claims data from a nationally-present U.S. insurance

16    company suggested that hundreds of thousands of individuals have likely been exposed to Elmiron

17    in the US and recognized a study finding that Elmiron-exposed patients were found to have a

18    significantly increased risk of being diagnosed with a new macular disease after seven years.

19    137.    In September 2019, the Emory team published further research in the Journal of

20    American Medical Association Ophthalmology ("JAMA Ophthalmology"), concluding that

21    Elmiron-associated macular degeneration "is a vision-threatening condition that can manifest in the

22

23

24    [20] https://www.ema.europa.eu/documents/scientific-conclusion/elmiron-h-c-psusa-00010614-201812-epar-scientific-conclusions-grounds-variation-terms-marketing_en.pdf (last visited, June 17, 2020).

25    [21] Id.

26    [22]https://www.ema.europa.eu/en/documents/product-information/elmiron-epar-product-information_en.pdf
[23] Adam M. Hanif and Nieraj Jain, *Clinical Pearls for a New Condition. Pentosan Polysulfate Therapy, a Common*
27    *Treatment for Interstitial Cystitis, Has Been Associated with a Maculopathy*, REVIEW OF OPHTHALMOLOGY
July 10, 2019, https://www.reviewofophthalmology.com/article/clinical-pearls-for-a-new-condition
28    [24] Id.

1   setting of long-term exposure to the drug."[25]

2   138.   Further, on September 23, 2019, the Canadian Product Monograph for Elmiron was

3   updated to include the following in the "Warnings and Precautions" section:

4   **Ophthalmologic**

5   Post-market cases of pigmentary maculopathy have been reported with chronic use
    of pentosan polysulfate sodium (PPS). Visual symptoms in these cases included
6   difficulty reading and prolonged dark adaptation. All patients should have regular
    ophthalmic examinations for early detection of pigmentary maculopathy,
7   particularly those with long-term use of PPS. If pigmentary maculopathy is
    confirmed, treatment discontinuation should be considered.[26]

8

9   139.   Shortly thereafter, Health Canada issued a Health Product Advisory informing the

10  Canadian public of the new warnings added to the Elmiron Product Monograph, but only in

11  Canada.[27]

12  140.   On October 1, 2019, two physicians from Harvard Medical School published a case

13  study that observed a very concerning serious medical issue – they noted that damage caused by

14  Elmiron continues to progress long after cessation of the drug.[28]  In their study, a patient continued

15  to exhibit worsening symptoms of PPS-associated retinal maculopathy for at least 6 years after she

16  stopped taking Elmiron.

17  141.   In November of 2019, a team from Emory and the University of Pennsylvania

18  published an epidemiological study in the British Journal of Ophthalmology which concluded that

19  "PPS users had significantly increased odds of having atypical maculopathy."[29]

20  142.   Also, in 2019, a team from Kaiser Permanente Northern California treated a patient

21

22

[25] Adam Hanif et al., *Phenotypic Spectrum of Pentosan Polysulfate Sodium-Associated Maculopathy: A multicenter Study*, 137 JAMA OPHTHALMOLOGY 1275, 1282 (Sep. 5, 2019),
https://jamanetwork.com/journals/jamaophthalmology/article-abstract/2749093
[26] https://pdf.hres.ca/dpd_pm/00053268.PDF
[27] https://www.canada.ca/en/health-canada/services/drugs-health-products/medeffect-canada/health-product-infowatch/health-product-infowatch-october-2019.html#elmiron
[28] Rachel M. Huckfeldt and Demetrios G Vavvas, *Progressive Maculopathy After Discontinuation of Pentosan Polysulfate Sodium*, 50 OPHTHALMIC SURGERY, LASERS AND IMAGING RETINA 656–59 (2019), ncbi.nlm.nih.gov/pubmed/31671200.
[29] Nieraj Jain et al., *Association of Macular Disease with Long-Term Use of Pentosan Polysulfate Sodium: Findings from a U.S. Cohort*, BRITISH JOURNAL OF OPHTHALMOLOGY (published online first, November 6, 2019), https://bjo.bmj.com/content/early/2019/11/06/bjophthalmol-2019-314765

23

who was previously misdiagnosed with Stargardt disease, but was actually suffering from Elmiron-related maculopathy.[30] In their case report, the ophthalmologists stressed that "failure to diagnose a medication toxicity in a timely fashion may lead to preventable irreversible vision loss."[31]

143.   The doctors noted "the present case adds a new layer of concern by demonstrating progressive maculopathy continuing for up to 6 years after cessation of PPS . . . this case emphasizes the need for a screening regimen that balances the demands on patients and physicians with the importance of prompt identification of early toxicity."[32]

144.   On January 20, 2020, another team of researchers published a paper in which they found a 20% prevalence of a unique PPS- associated maculopathy among a cohort of patients being treated at the University of California, Los Angeles.[33] Their study suggests "a significant risk of macular toxicity for PPS-treated patients," and that "more significant PPS exposure was associated with more severe atrophy."

145.   The Interstitial Cystitis Network, a health publishing company dedicated to IC, launched its own patient survey on the heels of the Emory Eye Center findings. As of April 2019, the Interstitial Cystitis Network had almost 1,000 participants, of which 53% reported eye disease.

146.   Patient reports on the Interstitial Cystitis Network Support Forum include:[34]

   a. June 23, 2019: "I have been diagnosed with macular degeneration and no one in my family has it. I have been on elmiron for 15 years. I decided even though the correlation is not extremely strong to go off it for the sake of my eyes . . . am hoping the degeneration will slow if not stop. Am not looking for it reverse course. Am also hoping that I do not go back to the pain . . . all I can do is try. I feel to be between a rock and a hard place. I am an artist so my eyes are truly needed to continue my work."

   b. February 3, 2019: "I saw the article too and took it to my ophthalmologist. She was very excited to see the research. She said that my macular

---

[30] Robin A. Vora et al., *A Case of Pentosan Polysulfate Maculopathy Originally Diagnosed as Stargardt Disease*, 17 AMERICAN JOURNAL OF OPHTHALMOLOGY CASE REPORTS 100604 (published online first, January 2020), http://www.sciencedirect.com/science/article/pii/S2451993620300086?via%3Dihub
[31] *Id.*
[32] *Id.* at 658.
[33] Derrick Wang et al., *Pentosan-Associated Maculopathy: Prevalence, Screening Guidelines, and Spectrum of Findings Based on Prospective Multimodal Analysis*, CANADIAN JOURNAL OF OPHTHALMOLOGY (in press, published online January 2020), http://www.canadianjournalofophthalmology.ca/article/S00008-4182(19)31272-4/fulltext
[34] Interstitial Cystitis Network Patient Support Forum. https://forum.ic-network.com

degeneration that had occurred after 18 years of taking Elmiron was an unusual shape that they had not seen before. She said that while it won't heal me, they hoped that they could stop this from happening to other patients."

c. March 25, 2019: "After 4 excruciating years, I was diagnosed with Interstitial Cystitis in 2003. I started on Elmiron and have taken it since then. I was diagnosed with macular degeneration in 2014. My severity is mild to moderate. The left eye is definitely worse. I can no longer drive at night. I'm pretty comfortable driving to places I am familiar with during the day. I am only 58. I dread the day I will not be able to drive."

147.     In July of 2020, a team from Emory, the University of Michigan and the Oregon Health and Science University published the results of a retrospective study in JAMA Ophthalmology which concluded that "[t]hese retrospective data among 11 patients suggest PPS-associated maculopathy continues to evolve after drug cessation for at least 10 years. In some cases, progressive retinal pigment epithelium atrophy encroaches on the foveal center and thus may pose a long-term threat to central vision".[35]

148.     In total, there are about two dozen articles published in professional medical and scientific journals detailing the serious adverse events caused by Elmiron, all of which was known by and available to Defendants.

149.     Despite numerous signs of the potential for severe retinal side effects, multiple studies conducted at top institutes, research published in major peer-reviewed journals, public warnings from prominent EU health agencies and Health Canada, and a warning placed in the European and Canadian Elmiron labeling, at all times Defendants were silent in the United States as to the harm until June 16, 2020.

150.     At all times Plaintiffs were prescribed, purchased, and ingested Elmiron prior to the label change on June 16, 2020, Defendants failed to warn patients, including the Plaintiffs, of:

a.     the risks of vision threatening retinal changes, including vision loss and maculopathy associated with Elmiron;

b.     the need for an ophthalmologic history prior to starting treatment with Elmiron;

---

[35] Rachel Shah et al., *Disease Course in Patients With Pentosan Plolysulfate Sodium-Associated Maculopathy After Drug Cessation*, JAMA OPHTHALMOLOGY (Published online July 9, 2020).

c.    the need for genetic testing if a family history of maculopathy or pattern dystrophy exists;

d.    the need for a comprehensive baseline retinal examination for patients with pre-existing ophthalmologic conditions prior to starting Elmiron;

e.    the need for ophthalmological monitoring commencing shortly after starting to take Elmiron, including but not limited to:

        i.  a baseline retinal examination within six months of starting treatment and periodically while continuing and after ceasing treatment;

        ii.  the need to re-evaluate the risks and benefits of continuing treatment if pigmentary changes in the retina develop, as they may be irreversible;

f.    the need for ophthalmological monitoring after discontinuing Elmiron;

g.    the ophthalmological imaging, testing, treatment, and/or monitoring required for patients already taking Elmiron;

h.    the increased risks associated with higher doses of Elmiron; and

i.    the increased risks associated with longer duration of use of Elmiron.

151.    Similarly, at all times Plaintiffs were prescribed, purchased, and ingested Elmiron prior to the label change on June 16, 2020, Defendants failed to warn physicians that were otherwise not aware of the information documenting the substantial health risks associated with taking Elmiron, including Plaintiffs' physicians other that Defendant Dr. Parsons (who was already well aware of such information), of:

a.    the risks of vision threatening retinal changes, including vision loss and maculopathy associated with Elmiron;

b.    the need for an ophthalmologic history prior to starting treatment with Elmiron;

c.    the need for genetic testing if a family history of maculopathy or pattern dystrophy exists;

d.    the need for a comprehensive baseline retinal examination for patients with pre-existing ophthalmologic conditions prior to starting Elmiron;

e.    the need for ophthalmological monitoring commencing shortly after starting to take Elmiron, including but not limited to:

      i.  a baseline retinal examination within six months of starting treatment and periodically while continuing and after ceasing treatment;

      ii.  the need to re-evaluate the risks and benefits of continuing treatment if pigmentary changes in the retina develop, as they may be irreversible;

f.    the need for ophthalmological monitoring after discontinuing Elmiron;

g.    the ophthalmological imaging, testing, treatment, and/or monitoring required for patients already taking Elmiron;

h.    the increased risks associated with higher doses of Elmiron; and

i.    the increased risks associated with longer duration of use of Elmiron.

152.    At all times Plaintiffs were prescribed, purchased and ingested Elmiron prior to the label change on June 16, 2020, the labeling for Elmiron did not contain any information regarding:

a.    the risks of vision threatening retinal changes, including vision loss and maculopathy associated with Elmiron;

b.    the need for an ophthalmologic history prior to starting treatment with Elmiron;

c.    the need for genetic testing if a family history of maculopathy or pattern dystrophy exists;

d.    the need for a comprehensive baseline retinal examination for patients with pre-existing ophthalmologic conditions prior to starting Elmiron;

e.    the need for ophthalmological monitoring commencing shortly after starting to take Elmiron, including but not limited to:

      i.  a baseline retinal examination within six months of starting treatment and periodically while continuing and after ceasing treatment;

      ii.  the need to re-evaluate the risks and benefits of continuing treatment if pigmentary changes in the retina develop, as they may be irreversible;

f.    the need for ophthalmological monitoring after discontinuing Elmiron;

g.    the ophthalmological imaging, testing, treatment, and/or monitoring required for patients already taking Elmiron;

h.    the increased risks associated with higher doses of Elmiron; and

i.    the increased risks associated with longer duration of use of Elmiron.

COMPLAINT

153.   Indeed, the Warnings section in the Elmiron label in the United States, during the relevant time period, read as follows:

# WARNINGS
## None.

154.   At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, the labeling for Elmiron did not list vision threatening retinal changes, vision loss, or maculopathy, despite the fact that it did list other serious side effects reported with the use of Elmiron.

155.   At all times Plaintiffs were prescribed, purchased, and ingested Elmiron the labeling for Elmiron did not list vision threatening retinal and macular changes, vision loss, or maculopathy in the Adverse Reactions section.

156.   In addition to the labeling that accompanied Elmiron, Defendants also prepared and distributed Elmiron marketing materials in the United States that was designed and distributed to patients, including their Elmiron "Patient Education Flyer," "Elmiron Patient Brochure," or "Patient Leaflet." Pursuant to the Defendants' marketing scheme, in conjunction with their design and distribution methods, these patient-facing materials constituted the sources of information most likely to be viewed by patients.

157.   The Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" and "Patient Leaflet" were documents created by Defendants and distributed to patients purporting to advise patients, of the benefits, risks, "Important Safety Information" and the direction to "Please read the ELMIRON® Patient leaflet..." associated with the use of Elmiron.

158.   At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, Defendants did not make any mention of the need for ophthalmological monitoring in any of their U.S. patient materials —including their Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" or "Patient Leaflet."

159.   At all times Plaintiffs were prescribed, purchased, and ingested Elmiron,

Defendants did not make any mention of the increased risks associated with higher doses of Elmiron in any of their U.S. patient materials —including their Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" or "Patient Leaflet."

160.    At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, Defendants did not make any mention of the increased risks associated with longer duration of use of Elmiron in any of their U.S. patient materials —including their Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" or "Patient Leaflet."

161.    At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, Defendants did not have any information in their U.S. patient materials – including their Elmiron "Patient Education Flyer," "Elmiron Patient Brochure," or "Patient Leaflet" that indicated Elmiron may cause, is linked to and/or is associated with vision threatening retinal changes, including vision loss and maculopathy.

162.    The "Elmiron Patient Brochure" in particular, contained sections entitled, "Important Safety Information," "What is the most important information I should know about ELMIRON® (pentosan polysulfate sodium) Capsules?" and "What does your doctor need to know?"

163.    The "Elmiron Patient Brochure" also recommended patients to "Please read the ELMIRON® Patient leaflet and discuss it with your doctor."

164.    Over the years that Elmiron was marketed and sold to patients in United States, including to Plaintiffs, Defendants made revisions and updates to the Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" and/or "Patient leaflet."

165.    At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, the Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" and/or "Patient leaflet" did not make any mention, or provide any warning to consumers, of the potential for vision threatening retinal and macular changes, including vision loss and maculopathy associated with Elmiron use.[36]

---

[36] Last visited April 19, 2020.

166.     At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, the Elmiron "Patient Education Flyer," "Elmiron Patient Brochure" and/or "Patient leaflet" did not make any mention, or provide any recommendation to consumers, of the need for ophthalmological monitoring while taking Elmiron or how to properly evaluate and screen Elmiron patients.

167.     JANSSEN     PHARMA     maintains     a     website     promoting     Elmiron, www.orthoelmiron.com. The website includes, among other things, sections and topics such as: "About Elmiron," "How Elmiron Works," "Important Safety Information," and "Patient Information."

168.     At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, the above-mentioned website did not make any mention, or provide any warning to consumers, of the potential for vision threatening retinal and macular changes, including vision loss and maculopathy associated with Elmiron use.[37]

169.     At all times Plaintiffs were prescribed, purchased, and ingested Elmiron, the above-mentioned website did not make any mention, or provide any recommendation to consumers, of the need for ophthalmological monitoring while taking, and after discontinuing, Elmiron or how to properly evaluate and screen Elmiron patients.

170.     By creating the "Elmiron Patient Brochure," Elmiron "Patient Education Flyer" and "Patient Leaflet," all of which included important safety information which the Defendants intended to provide to the users and potential users of Elmiron, Defendants assumed a duty to fully, completely and/or adequately warn of all the risks, adverse events and proper usage of Elmiron that were known or should have been known by Defendants.

171.     However, at all times Plaintiffs were prescribed, purchased, and ingested Elmiron, none of these patient/user materials ("Elmiron Patient Brochure," Elmiron "Patient Education Flyer" and "Patient Leaflet") contained any warning or adverse event information regarding vision threatening retinal and macular changes, including vision loss and maculopathy associated with

---

[37] Last visited April 19, 2020.

1   Elmiron, the need for ophthalmological monitoring, while taking, and after discontinuing, Elmiron,

2   or how to properly evaluate and screen Elmiron patients.

3        172.    By creating the website www.orthoelmiron.com, which included important safety

4   information which the Defendants intended to provide to the users and potential users of Elmiron,

5   Defendants assumed a duty to fully, completely and/or adequately warn of all the risks, adverse

6   events and proper usage of Elmiron that were known or should have been known by Defendants.

7        173.    However, at all times Plaintiffs were prescribed, purchased, and ingested Elmiron,

8   the website never contained any warning or adverse event information regarding vision threatening

9   retinal and macular changes, including vision loss and maculopathy associated with Elmiron, the

10  need for ophthalmological monitoring while taking, and after discontinuing, Elmiron, or how to

11  properly evaluate and screen Elmiron patients.

12       **C.    Defendants Could Have Unilaterally Strengthened the Elmiron Drug Label**
         **After FDA Approval in the United States under the Applicable Regulations**
13       **Without Prior FDA Approval**

14       174.    Defendants could have strengthened the Elmiron label at any time under applicable

15  regulations without prior FDA approval. Applicable regulations permit manufacturers to strengthen

16  drug labels based on "newly acquired information" – that is, information that was not previously

17  presented to the FDA.

18       175.    As described above, Defendants received significant "newly acquired information"

19  on many occasions after the launch of Elmiron that should have resulted in a label change warning

20  of the risks of vision threatening retinal changes, vision loss, and/or maculopathy associated with

21  Elmiron. The then newly acquired information came in the forms including but not limited to post-

22  market adverse events, newly published peer reviewed studies, government announcements and

23  updated labeling.

24       176.    Due to the nature of the serious and irreversible injuries to the retina and macula,

25  as well as the need for ophthalmological monitoring while taking Elmiron and after discontinuing

26  Elmiron, the method used to update the label with this new warning should have been the method

27  that would have updated the label in the quickest period of time.

28       177.    While Defendants had ample opportunity to strengthen their label to add a warning

1 | regarding PPS Associated Maculopathy, prior to June 16, 2020, they declined to do so.

2 | 178.    In fact, though Defendants have made at least five (5) changes to the label

3 | throughout the time Elmiron has been on the market, none of those changes included a warning that

4 | Elmiron could cause PPS Associated Maculopathy.

5 | 179.    There is no clear evidence that the FDA would not have approved a label change

6 | adding a warning regarding vision threatening retinal and macular changes, including vision loss

7 | and maculopathy at any time from the date of approval (September 26, 1996) to the present.

8 | 180.    There is no clear evidence that the FDA would not have approved a warning

9 | regarding vision threatening retinal and macular changes, including vision loss and maculopathy to

10 | be included in the original label at the time of approval.

11 | 181.    By failing to update the label to warn Plaintiffs, consumers and physicians of the

12 | risk of vision threatening retinal and macular changes associated with using Elmiron, Defendants

13 | acted in a gross and flagrant character, evincing reckless disregard for human life, and of the safety

14 | of persons exposed to its dangerous drug.

15 | **D.    June 16, 2020 Label Change**

16 | 182.    On June 24, 2019, Defendants submitted a Supplemental New Drug Application

17 | ("sNDA") seeking to revise the Warnings and Post-Marketing Experience sections of the label and

18 | to update the Patient labeling for Elmiron to include warnings relating to vision threatening retinal

19 | changes and maculopathy.

20 | 183.    Defendants' supplemental NDA was not approved until June 16, 2020.

21 | 184.    On that date, the label was amended to include the following in the "Warnings"

22 | section:

23 | **Retinal Pigmentary Changes**

24 | Pigmentary changes in the retina, reported in the literature as pigmentary
maculopathy, have been identified with long-term use of ELMIRON® (see

25 | ADVERSE REACTIONS). Although most of these cases occurred after 3 years of
use or longer, cases have been seen with a shorter duration of use. While the

26 | etiology is unclear, cumulative dose appears to be a risk factor.

27 | Visual symptoms in the reported cases included difficulty reading, slow adjustment
to low or reduced light environments, and blurred vision. The visual consequences

28 | of these pigmentary changes are not fully characterized. Caution should be used in

patients with retinal pigment changes from other causes in which examination findings may confound the appropriate diagnosis, follow-up, and treatment. Detailed ophthalmologic history should be obtained in all patients prior to starting treatment with ELMIRON®. If there is a family history of hereditary pattern dystrophy, genetic testing should be considered. For patients with pre-existing ophthalmologic conditions, a comprehensive baseline retinal examination (including color fundoscopic photography, ocular coherence tomography (OCT), and auto-fluorescence imaging) is recommended prior to starting therapy. A baseline retinal examination (including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment. If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible. Follow-up retinal examinations should be continued given that retinal and vision changes may progress even after cessation of treatment.

185.    The "Post-Marketing Experience" section was also amended to include the following:

**Post-Marketing Experience**
The following adverse reactions have been identified during post approval use of pentosan polysulfate sodium; because these reactions were reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure:

• pigmentary changes in the retina (see WARNINGS).

186.    While Defendants had the opportunity to immediately update the label for Elmiron under by simply sending the FDA a "supplemental submission," Defendants instead chose to submit an sNDA which is a much lengthier and time-consuming process, thereby delaying the dissemination of this important safety information to physicians and patients.

187.    Defendants' failure timely to amend the Elmiron label resulted in unnecessary further delay in disseminating important safety information to physicians and patients. This additional, needless delay prevented physicians and patients from obtaining this critical information in the timeliest manner possible, which could have guided their care and treatment and allowed for an earlier diagnosis of the associated conditions.

188.    The recently added warnings in the US label remain inadequate, however, as they fail to warn, instruct and advise current or past patients who are or were taking Elmiron, as to what they should do and what procedures they should follow, in order to properly screen, test and monitor for vision and/or retinal and macular damage as a result of their use of Elmiron.

E.     **Elmiron is no Better than Placebo in Treating Interstitial Cystitis**

189.     As described above, Elmiron was eventually approved by the FDA based on two seriously flawed clinical trials that were determined not to be adequate and well controlled, in part due to a lack of independence, as well as compassionate use data that the FDA had twice previously determined to be inadequate.

190.     Prior to approval, one of the top concerns expressed by the FDA was that when the data from a single investigator (Dr. Parsons) was removed, there was no proof that Elmiron was an effective treatment IC/Bladder Pain Syndrome.

191.     Since the initial approval, additional data has been published that serves as further evidence of Elmiron's lack of efficacy.

192.     In a March 2012 Citizen's Petition to the FDA requesting a bioequivalence study for any new generics coming to market – in an effort to maintain its market position and block generics from coming to market – Defendant JANSSEN PHARMA admitted that "the drug has low bioavailability, is poorly absorbed from the gastrointestinal tract, and cannot be reliably assayed by determining serum levels."[38]

193.     JANSSEN PHARMA further elaborated:

> ***ELMIRON has not yet been fully characterized.*** ELMIRON contains a mix of many components, which vary in chain length (molecular weight), number and location of glucuronic acid sidechains, and number of location of sodium sulfate groups. ***Moreover, no definitive information exists to identify which of the components are active (i.e., responsible for the safety and efficacy of ELMIRON)*** . . . The information presented above demonstrates that due to the ***unknown etiology of IC, the inability to characterize ELMIRON and understand how it works in the body, the difficulty of measuring PPS in plasma, blood, or urine, and the lack of a reliable bioassay to measure the product's effects,*** conventional methods of determining bioequivalence are inadequate.[39]

194.     In 2015, an article was published in the Journal of Urology comparing the efficacy and safety of the recommended dose of Elmiron with a third of the daily dose of Elmiron and with

[38] March 26, 2012 Janssen Citizen Petition requesting FDA adoption of appropriate bioequivalence requirements to govern approval of any abbreviated new drug application ("ANDA") relying on ELMIRON (pentosan polysulfate sodium) as its reference product (hereinafter "Janssen Citizen Petition") (emphasis added).

[39] *Id.* (emphasis added).

placebo. This study involved 368 patients with IC/bladder pain syndrome and took place over the course of 24 weeks. The study found that "[t]here was no statistically significant difference between the pentosan polysulfate sodium group and the placebo group or between the 2 pentosan polysulfate sodium groups for the primary end point, defined as responder achieving a 30% or greater reduction from the baseline ICSI total score at study end." The authors concluded "[r]esults of this study in a broad population of patients with symptoms consistent with Interstitial Cystitis revealed no treatment effect vs placebo for pentosan polysulfate sodium at the currently established dose or at a third of the daily dose."[40]

195.    The low efficacy and bioavailability of Elmiron are even more troubling in light of the significant risks of permanent vision loss and retinal issues caused by the drug. These design defects render Elmiron more dangerous than other drugs and treatment options designed to treat Interstitial Cystitis and cause an unreasonable increased risk of injury, including but not limited to permanent vision and retinal injuries.

**F.    Defendants' Failure to Test Elmiron**

196.    Defendants admit that "the mechanism of action of pentosan polysulfate sodium in Interstitial Cystitis is not known," and Defendants have failed to conduct tests to determine the mechanism of action of the drug.

197.    In the Elmiron NDA file, the FDA noted that: "Elmiron works by binding to exposed epithelium," which may explain its apparent effect on the urinary bladder epithelium.

198.    Defendants knew or should have known of the potential impact of the drug on other epithelial cells – particularly the retinal epithelial cells of the eye – but failed to adequately test for these adverse events.

---

[40] J Curtis Nickel et al. *Pentosan Polysulfate Sodium for Treatment of Interstitial Cystitis/Bladder Pain Syndrome: Insights From a Randomized, Double-Blind, Placebo Controlled Study*, JOURNAL OF UROLOGY (published online first September 20, 2014).

1    199.    Defendants acknowledged that their Phase III testing of Elmiron was "subjective"

2  and that "an objective measure" may be more appropriate. JANSSEN PHARMA stated:

3            The Phase III studies on which the ELMIRON approval was
             initially based assessed the effect of the drug on subjects' pain
4            and discomfort levels, as measured by the subjects' individual
             assessments. Pain and discomfort, while key symptoms of the
5            Interstitial Cystitis diagnosis, are inherently subjective elements.
             Therefore, while patients' individual assessments based on these
6            subjective impressions were useful in the Phase III ELMIRON
             trials to demonstrate a clinical benefit as compared to placebo, *an*
7            *objective measure is more appropriate* for studies with clinical
             endpoints to assess bioequivalence.[41]
8
9    200.    Furthermore, JANSSEN PHARMA not only failed to conduct pharmacokinetic

10 ("PK") and pharmacodynamic ("PD") testing on the drug, but in fact advocated against such testing,

stating:

11
12           *A PK study, while generally appropriate for drugs that are*
             *systemically absorbed, is inappropriate* for determining
13           bioequivalence of an oral dosage form of PPS. Although PPS is
             systemically absorbed and distributed to the bladder, it has
14           extremely low bioavailability; even with the use of radioactive
             drug, PPS is difficult to detect in blood or plasma. Due to low
15           serum concentration and the inherent complexity of the product,
             attempts by the manufacturer of the product, bene, to develop a
16           sensitive and reliable bioassay have been futile. *Indeed, Janssen*
             *is not aware of any analytical techniques presently available to*
17           *predict or measure systemic concentration of PPS* . . . Finally,
             because the mechanism of action of PPS and the pathophysiology
18           of Interstitial Cystitis is unknown, *there is no known*
             *pharmacodynamic marker other than clinical effect measured*
19           *as reduction of pain.*[42]

20   201.    To be clear, PK and PD testing is not "inappropriate." To the contrary, an

21 understanding of pharmacokinetics of a drug – including absorption, distribution, metabolism, and

22 excretion – is a critical aspect of drug design and is crucial to understanding how the drug interacts

23 with the human body and evaluate potential risks associated with the drug.

24   **G.    Exemplary/Punitive Damages**

25   202.    Defendants' conduct as alleged herein was grossly negligent and done with reckless

26 disregard for human life.

27 _____

28 [41]Janssen Citizen Petition (emphasis added).
   [42]*Id.* (emphasis added).

36

1     203.    Defendants' conduct as alleged herein was done with malice.

2     204.    Defendants acted with oppression, fraud or malice and their actions were carried on

3 with a willful and conscious disregard of the safety of others, including the Plaintiffs.

4     205.    Defendants were fully aware of the safety risks of Elmiron dating back to their

5 original clinical trials. Nonetheless, Defendants deliberately crafted their label, marketing,

6 promotion, and prescription to mislead consumers/patients and unknowing physicians on these

7 serious and permanent life-altering injuries.

8     206.    This conduct by the Defendants was not done by accident. Rather, Defendants knew

9 that they could turn a profit by convincing unknowing physicians and consumers/patients that

10 Elmiron came without any serious harmful risks. Defendants further knew that full disclosure of the

11 true risks of Elmiron would limit the amount of money it would make selling the drug. Defendants'

12 objective was accomplished not only through inadequate warnings in their label, but through a

13 comprehensive scheme of misleading marketing and deceptive omissions more fully alleged

14 throughout this pleading. Plaintiffs' physicians (besides Defendant Parsons) and Plaintiffs were

15 denied the opportunity and the right to have a discussion in order to make an informed decision

16 about whether to prescribe and take Elmiron. Defendants accomplished this by failing to provide

17 the serious risks, and specifically those affecting vision and the fact that the damage may be

18 irreversible, as well as Elmiron's lack of efficacy. Such conduct by Defendants was done with

19 conscious disregard of Plaintiffs' rights.

20     207.    Accordingly, Plaintiffs request punitive damages against Defendants for the harms

21 caused to Plaintiffs.

22            **TOLLING OF THE STATUTE OF LIMITATIONS**

23     **A.**    **Discovery Rule Tolling**

24     208.    As a result of the acts and omissions of Defendants, neither the Plaintiffs, nor

25 Plaintiffs' physicians (other than Defendant Dr. Parsons, who was at all relevant times aware of the

26 significant health risks) could have discovered, through the exercise of reasonable due diligence,

27 that exposure to Elmiron was associated with increased exposure to vision threatening retinal and

28 macular changes, including vision loss and maculopathy as set forth above. Thus, the applicable

1   limitations periods did not begin to accrue until Plaintiffs discovered, or through the exercise of

2   reasonable diligence should have discovered, Defendants' wrongful acts and omissions.

3          **B.     Fraudulent Concealment Tolling**

4          209.    All applicable statutes of limitation have also been tolled by Defendants' knowing

5   and active fraudulent concealment and denial of the vision threatening retinal and macular changes,

6   including vision loss and maculopathy associated with Elmiron throughout the time period relevant

7   to this action.

8          210.    Defendants are under a continuing duty to disclose the true character, quality, safety

9   issues and safety concerns of Elmiron to its users and prescribers, including Plaintiffs specifically.

10  To date, Defendants have nevertheless failed to adequately and fully inform consumers and doctors

11  about the vision threatening retinal and macular changes, including vision loss and maculopathy and

12  its potential irreversibility associated with Elmiron, as discussed above.

13         211.    Plaintiffs reasonably relied upon Defendants' knowing, affirmative or active

14  concealment when Plaintiffs continued to use Elmiron as prescribed.

15         212.    Because Defendants actively concealed the true risk of vision threatening retinal

16  and macular changes, including vision loss and maculopathy associated with Elmiron, they are

17  estopped from relying on any statutes of limitations defense.

18                              **FIRST CAUSE OF ACTION**
                               **Strict Liability – Failure to Warn**
19

20         213.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

21  below.

22         214.    As more fully alleged above and incorporated herein by reference, Defendants

23  failed to warn Plaintiffs and Plaintiffs' physicians (other than Defendant Dr. Parsons, who was at

24  all relevant times aware of the significant health risks) of the unavoidable risks and side effects

25  associated with Elmiron that Defendants knew or should have known, specifically, the risk of vision

26  threatening retinal and macular changes, including vision loss and maculopathy.   Defendants

27  therefore failed to provide Plaintiffs with the option to make an informed choice regarding use the

28  product.

215. Had Plaintiffs been provided with a warning regarding the risk of vision threatening retinal and/or macular changes, including vision loss and/or maculopathy, Plaintiffs would not have chosen to take Elmiron.

216. As more fully alleged above and incorporated herein by reference, Defendants failed to adequately instruct Plaintiffs as to how Elmiron should be used in order to eliminate or reduce the risk of harm. Defendants therefore failed to provide information that could have allowed Plaintiffs to use the product in a way that would minimize the degree of danger.

217. Had Plaintiffs been adequately instructed on how Elmiron should be used in order to eliminate or reduce the risk of harm, Plaintiffs' injuries could have been avoided or prevented from developing into the severe vision damage that Plaintiffs are now experiencing.

218. As more fully alleged above and incorporated herein by reference, at the time Plaintiffs were prescribed, purchased and ingested Elmiron, no section of the label, including the "Warnings and Precautions" and the "Adverse Reactions" sections, contained any warnings regarding the risk of vision threatening retinal or macular changes, including vision loss and maculopathy.

219. As more fully alleged above and incorporated herein by reference, at the time Plaintiffs were prescribed, purchased and ingested Elmiron, no section of the label, including the "Warnings and Precautions" and the "Adverse Reactions" sections, contained any instructions regarding how Elmiron should be used, including how to properly evaluate Elmiron patients, in order to eliminate or reduce the risk of harm.

220. As more fully alleged above and incorporated herein by reference, at the time Plaintiffs were prescribed, purchased, and ingested Elmiron the "Elmiron Patient Brochure," Elmiron "Patient Education Flyer," "Patient Leaflet" and www.orthoelmiron.com, which included important safety information regarding Elmiron, did not contain a warning regarding vision threatening retinal or macular changes, including vision loss and maculopathy associated with Elmiron.

221. As more fully alleged above and incorporated herein by reference, at the time Plaintiffs were prescribed, purchased, and ingested Elmiron the "Elmiron Patient Brochure,"

39

1   Elmiron "Patient Education Flyer," "Patient Leaflet" and www.orthoelmiron.com, which included

2   important safety information regarding Elmiron, did not contain instructions regarding how Elmiron

3   should be used, including how to properly evaluate Elmiron patients, in order to eliminate or reduce

4   the risk of harm.

5       222.   By publishing direct to patient information in the "Elmiron Patient Brochure,"

6   Elmiron "Patient Education Flyer," "Patient Leaflet" and on the www.orthoelmiron.com, including

7   important safety information, Defendants assumed the duty to directly warn patients of all of the

8   risks associated with Elmiron that were known or should have been known by Defendants.

9       223.   Defendants knew or should have known through testing, scientific knowledge,

10  advances in the field, adverse events, communications with patients, communications with

11  physicians and otherwise, that Elmiron created a risk of serious and potentially irreversible vision

12  threatening retinal and macular changes, including vision loss and maculopathy, and was unsafe and

13  dangerous to Plaintiffs and other consumers, all about which Defendants failed to warn.

14      224.   The Elmiron supplied to Plaintiffs by Defendants was unsafe, dangerous and had

15  inadequate warnings and/or instructions at the time it was sold to Plaintiffs.

16      225.   The dangerous propensities associated with Elmiron were either known by

17  Defendants, or reasonably scientifically knowable, at the time Plaintiffs were prescribed, purchased,

18  and ingested Elmiron.

19      226.   At times after Elmiron was supplied to Plaintiffs, Defendants acquired additional

20  knowledge and information confirming the dangerous nature of Elmiron.

21      227.   Despite having this knowledge and information, Defendants failed to issue adequate

22  warnings and/or post-sale warnings or notifications to unknowing physicians that Elmiron causes

23  serious and potentially irreversible vision threatening retinal and macular changes, including vision

24  loss and maculopathy.

25      228.   Despite having this knowledge and information, as more fully alleged above and

26  incorporated herein by reference, Defendants failed to issue adequate warnings and/or post-sale

27  warnings or notifications to patients, and specifically Plaintiffs herein, that Elmiron causes serious

28  and potentially irreversible vision threatening retinal and macular changes, including vision loss and

1  maculopathy.

2      229.    Despite having this knowledge and information, as more fully alleged above and

3  incorporated herein by reference, Defendants failed to issue adequate warnings and/or post-sale

4  warnings or notifications to physicians regarding how Elmiron should be used, including how to

5  properly evaluate Elmiron patients, in order to eliminate or reduce the risk of harm.

6      230.    Defendants failed to provide adequate warnings to users, purchasers, or unknowing

7  prescribers of Elmiron, including Plaintiffs and prescribing physicians and instead continued to sell

8  Elmiron in an unreasonably dangerous form without adequate warnings or instructions.

9      231.    By failing to adequately test and research harms associated with Elmiron use,

10  patients and the medical community, including unknowing prescribing doctors, were inadequately

11  informed about the true risk-benefit profile of Elmiron and were not sufficiently aware that serious

12  and potentially irreversible vision threatening retinal and macular changes, including vision loss and

13  maculopathy might be associated with Elmiron use.

14      232.    By failing to provide appropriate precautions about Elmiron use, patients and the

15  medical community, including unknowing prescribing doctors, were inadequately informed about

16  the true risk-benefit profile of Elmiron and were not sufficiently aware that serious and potentially

17  irreversible vision threatening retinal and macular changes, including vision loss and maculopathy

18  might be associated with Elmiron use.

19      233.    Nor were the medical community, patients, patients' families or regulators,

20  including Plaintiffs' physicians and Plaintiffs herein (other than Defendant Dr. Parsons, who was at

21  all relevant times aware of the significant health risks), appropriately informed and/or warned by

22  Defendants that serious and potentially irreversible vision threatening retinal and macular changes,

23  including vision loss and maculopathy might be a side effect of Elmiron use and should or could be

24  reported as an adverse event.

25      234.    As a direct and proximate result of Defendants' conduct and the dangerous nature

26  of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished

27  enjoyment of life, past and future medical expenses and other economic loss.

28

# SECOND CAUSE OF ACTION
## Strict Liability – Defective Design

235.   Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

236.   At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, prescribing and/or promoting Elmiron and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

237.   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended and foreseeable use.

238.   Defendants breached that duty when they created a product unreasonably dangerous for its intended and foreseeable use.

239.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers, and Defendants are therefore strictly liable for the injuries sustained by Plaintiffs.

240.   The Elmiron supplied to Plaintiffs by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and a defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially irreversible vision issues and retinal or macular harm to Plaintiffs and other consumers.

241.   Elmiron is a medication prescribed primarily for IC, a bladder condition. Elmiron in fact causes serious and potentially irreversible vision issues, retinal harm, PPS toxicity, PPS Maculopathy, and/or could interfere with the normal health, healing, proliferation, migration, and/or growth of cells, including epithelial cells and RPE cells, harming Plaintiffs and other consumers.

242.   Plaintiffs, ordinary consumers, and prescribers would not expect an Interstitial Cystitis drug designed, marketed, and labeled for bladder treatment to cause irreversible vision and retinal damage.

243.    The Elmiron supplied to Plaintiffs by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been adequately tested, was in an unreasonably dangerous and defective condition, and posed a risk of serious and potentially irreversible vision issues and retinal harm to Plaintiffs and other consumers.

244.    The Elmiron supplied to Plaintiffs by Defendants was defective in design or formulation in that its limited and unproven effectiveness, low efficacy, and low bioavailability, did not outweigh the risks of serious and potentially irreversible vision issues and retinal harm posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of the Elmiron drug makes the product unreasonably dangerous.

245.    These design defects render Elmiron more dangerous than other drugs and therapies used to treat Interstitial Cystitis and causes an unreasonable increased risk of injury, including but not limited to potentially including retinal or macular harm.

246.    Defendants knew or should have known through testing, scientific knowledge, advances in the field, published research in major peer-reviewed journals, or otherwise, that Elmiron created a risk of serious and potentially irreversible vision issues, retinal and macular harm, PPS toxicity, PPS Maculopathy, and/or could interfere with the normal health, healing, proliferation, migration, and/or growth of cells, including epithelial cells and RPE cells.

247.    Elmiron is defective and unreasonably dangerous to Plaintiffs and other consumers in that, despite early indications and concerns that Elmiron use could result in vision issues, Defendants failed to adequately test or study the drug, including but not limited to: pharmacokinetics and pharmacodynamics of the drug, its effects on vision and retinal epithelial cells, the potential effects and risks of long-term use, the potential for inter-patient variability, and/or the potential for a safer effective dosing regimen.

248.    As a direct and proximate result of Defendants' conduct and the dangerous nature of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished enjoyment of life, past and future medical expenses and other economic loss.

**THIRD CAUSE OF ACTION**
**Breach of Express Warranty**

249.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

250.    Defendants expressly warranted to physicians and consumers, including Plaintiffs and Plaintiffs' physicians, that Elmiron was safe, well-tolerated, and does not carry the risk of serious and potentially irreversible vision threatening retinal and macular changes, including vision loss and maculopathy.

251.    Elmiron does not conform to these express representations because it is neither safe, nor well-tolerated, and it significantly increases the risk of serious and potentially irreversible vision threatening retinal and macular changes, including vision loss and maculopathy.

252.    This risk was either known or reasonably scientifically knowable to Defendants at the time Plaintiffs were prescribed, purchased, and ingested Elmiron.

253.    As a direct and proximate result of Defendants' conduct and the dangerous nature of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished enjoyment of life, past and future medical expenses and other economic loss.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Warranty**

254.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth below.

255.    At the time Defendants marketed, sold and distributed Elmiron, Defendants knew of the use for which Elmiron was intended and they impliedly warranted Elmiron to be of merchantable quality, safe and fit for such use.

256.    Defendants knew, or had reason to know, that Plaintiffs and Plaintiffs' physicians would rely on Defendants' judgment and skill in providing Elmiron for its intended use.

257.    Plaintiffs and Plaintiffs' physicians reasonably relied upon the skill and judgment of Defendants as to whether Elmiron was of merchantable quality, safe and fit for its intended use.

258.    Contrary to such implied warranty, Elmiron was not of merchantable quality or safe

1  or fit for its intended use, because the product was and is, unreasonably dangerous and unfit for the

2  ordinary purposes for which Elmiron was used, was not adequately labeled, as it failed to warn of

3  risks reasonably scientifically knowable to Defendants or instruct prescribers how to minimize the

4  degree of danger, and did not conform to the promises or affirmations of fact made in the label.

5       259.    As a direct and proximate result of Defendants' conduct and the dangerous nature

6  of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished

7  enjoyment of life, past and future medical expenses and other economic loss.

**FIFTH CAUSE OF ACTION**
**Negligence**

10       260.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

11  below.

12       261.    At all times material herein, Defendants had a duty to exercise reasonable care and

13  had a duty to comply with existing standards of care in the in all aspects of the testing, inspection,

14  packaging, labeling, distribution, marketing, promotion, advertising, sale, warning, post-sale

15  warning, testing and research to assure the safety of the product when used as intended or in a way

16  that Defendants could reasonably have anticipated and to assure that the consuming public,

17  including Plaintiffs and Plaintiffs' physicians, obtained accurate information and adequate

18  instructions for the safe use of Elmiron

19       262.    As more fully alleged above and incorporated herein by reference, Defendants had

20  a duty to warn Plaintiffs, Plaintiffs' physicians and the public in general of Elmiron's dangers and

21  serious side effects, including serious and potentially irreversible vision issues and retinal harm, and

22  how Elmiron should be used, including how to properly evaluate Elmiron patients, in order to

23  eliminate or reduce the risk of harm and since it was reasonably foreseeable that an injury could

24  occur because of Elmiron's use.

25       263.    At all times material herein, Defendants failed to exercise reasonable care and failed

26  to comply with existing standards of care and knew, or in the exercise of reasonable care should

27  have known, that Elmiron was not properly tested, inspected, packaged, labeled, warned about,

28  distributed, marketed, advertised, formulated, promoted, examined, maintained, sold, prepared, or a

1  combination of these acts.

2  264.   Each of the following acts and omissions herein alleged was negligently and

3  carelessly performed by Defendants, resulting in a breach of the duties set forth above. These acts

4  and omissions include, but are not restricted to:

5  a.  Negligent and careless research and testing of Elmiron;

6  b.  Negligent and careless failure to give adequate warnings that would attract
   the attention of Plaintiffs, Plaintiffs' physicians and the public in general of

7  the potentially dangerous, defective, unsafe and deleterious propensity of
   Elmiron and of the risks associated with its use;

8

   c.  Negligent and careless failure to provide instructions on ways to safely use

9  Elmiron to avoid injury, including how to properly evaluate Elmiron
   patients;

10

   d.  Negligent and careless failure to provide instructions regarding the need for

11  ophthalmological monitoring while taking Elmiron;

12  e.  Negligent and careless failure to provide instructions regarding the need for
   ophthalmological monitoring after discontinuing Elmiron;

13

   f.  Negligent and careless failure to explain the mechanism, mode and types of

14  adverse events associated with Elmiron;

15  g.  Negligent representations that Elmiron was safe or well- tolerated; and

16  h.  Negligent and careless failure to issue adequate post-sale warnings that
   Elmiron causes an increased risk of serious and potentially irreversible

17  vision threatening retinal and macular changes, including vision loss and
   maculopathy.

18

   i.  Negligent and careless design or formulation of Elmiron;

19

   j.  Negligent and careless failure to conduct postmarketing surveillance of

20  adverse events associated with Elmiron.

21  265.   As a direct and proximate result of Defendants' conduct and the dangerous nature

22  of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished

23  enjoyment of life, past and future medical expenses and other economic loss.

24  **SIXTH CAUSE OF ACTION**
   **Fraud/Concealment**

25

26  266.   Plaintiffs reallege and incorporate the allegations made above as if fully set forth

27  below.

28  267.   At all relevant times, Defendant had the duty and obligation to truthfully represent

46
COMPLAINT

1   the facts concerning Elmiron to Plaintiffs and Plaintiffs' otherwise uninformed physicians.

2        268.    Defendants owed a duty to warn because they were in possession of information

3   about Elmiron that was not readily available to Plaintiffs and Plaintiffs' otherwise uninformed

4   physicians.  Defendants only made partial representations about Elmiron reasonably relied upon by

5   Plaintiffs and Plaintiffs' otherwise uninformed physicians.

6        269.   Defendants willfully deceived Plaintiffs, Plaintiffs' otherwise uninformed

7   healthcare providers, the medical community, and the public in general by concealing and/or

8   omitting material information concerning Elmiron, which Defendants had a duty to disclose, thus

9   misrepresenting the true nature of the medications and its safety/efficacy.

10       270.   Indeed, Defendants' omission of important safety data served as a misrepresentation

11   to consumers and otherwise uninformed physicians, including Plaintiffs and Plaintiffs' physicians

12   and the public in general, that Elmiron was safe or well- tolerated, when, in fact, Elmiron was

13   dangerous to the well-being of patients.

14       271.   Specifically, as more fully alleged above and incorporated herein by reference,

15   Defendants intentionally suppressed, concealed and omitted material facts in the promotional,

16   marketing and labeling communications about the risks and benefits of Elmiron to Plaintiffs and

17   Plaintiffs' otherwise uninformed healthcare providers, including but not limited to, the risk of

18   serious and potentially irreversible vision threatening retinal and macular changes, including vision

19   loss and maculopathy associated with Elmiron and instructions on how to safely use Elmiron,

20   including how to properly evaluate Elmiron patients, in order to eliminate or reduce the risk of harm.

21       272.   Defendants had exclusive possession and/or knowledge of this information and

22   material facts.

23       273.   As more fully alleged above and incorporated herein by reference, at the time

24   Defendants promoted Elmiron without disclosing the material facts described above, they knew or

25   should have known that Elmiron carried a risk of serious and potentially irreversible vision

26   threatening retinal changes, including vision loss and maculopathy.

27       274.   As more fully alleged above and incorporated herein by reference, at the time

28   Defendants promoted Elmiron without disclosing the material facts described above, they knew or

1   should have known that patients taking Elmiron should be provided with instructions regarding how

2   to safely use Elmiron, including how to properly evaluate Elmiron patients, in order to eliminate or

3   reduce the risk of harm.

4         275.    Defendants failed to exercise reasonable care and competence in obtaining or

5   communicating information regarding the safe use of Elmiron and otherwise failed to exercise

6   reasonable care in transmitting information to Plaintiffs, Plaintiffs' otherwise uninformed

7   physicians and the public in general.

8         276.    Defendants made the aforesaid misrepresentations by omission in the course of

9   Defendants' business as manufacturers and distributors of Elmiron despite having no reasonable

10   basis to omit this critical information.

11         277.    At the time the aforesaid misrepresentations by omission were made, Defendants

12   intended to induce Plaintiffs or Plaintiffs' otherwise uninformed physicians to rely upon such

13   misrepresentations.

14         278.    At the time the aforesaid misrepresentations by omission were made by Defendants

15   and at the time Plaintiffs received Elmiron, Plaintiffs or Plaintiffs' otherwise uninformed physicians

16   and the public in general, reasonably believed them to be true. In reasonable and justified reliance

17   upon said misrepresentations by omission, Plaintiffs used Elmiron.

18         279.    Defendants knew or should have known, that this information was not readily

19   available to Plaintiffs and Plaintiffs' otherwise uninformed healthcare providers, and Plaintiffs and

20   Plaintiffs' otherwise uninformed healthcare providers did not have an equal opportunity to discover

21   the truth.

22         280.    As a direct and proximate result of Defendants' conduct and the dangerous nature

23   of Elmiron, Plaintiffs suffered serious injury, pain and suffering, mental anguish, diminished

24   enjoyment of life, past and future medical expenses and other economic loss.

25   **SEVENTH CAUSE OF ACTION**
   **Unfair Business Practices (Cal. Bus. & Prof. Code §§ 17200, et seq.)**

26

27         281.    Plaintiffs reallege and incorporate the allegations made above as if fully set forth

28   below. Plaintiffs assert this Seventh Cause of Action on behalf of themselves and all other similarly-

1  situated persons in California that, on or after June 15, 2018, paid for Elmiron prescriptions directly

2  or indirectly without being told of the risk of serious and potentially irreversible vision damage

3  inherent in its use.

4       282.    By engaging in the above-described conduct, Defendants, and each of them, acted

5  in a manner that is unlawful, unfair, and fraudulent, and have thus engaged in unfair business

6  practices to the extreme detriment of Plaintiffs, which conduct is prohibited under California

7  Business & Professions Code sections 17200, et seq.

8       283.    Defendants' conduct has caused Plaintiffs to suffer harm, including through the

9  payment of monies, including without limitation retail prices and "co-pays," charged in connection

10  with Plaintiffs' use of Elmiron.

11       284.    Plaintiffs are thus entitled to restitutionary and injunctive relief, including without

12  limitation disgorgement of any unlawful gains that Defendants have obtained as a result of their

13  unlawful, unfair and fraudulent conduct.

14           **CLASS ACTION ALLEGATIONS**

15           **(Seventh Cause of Action Only)**

16       285.    Based on the facts and circumstances alleged herein, Plaintiffs bring the Seventh

17  Cause of Action for Unfair, Unlawful and Deceptive Business Practices pursuant to Cal. Bus. &

18  Prof. Code §§ 17200, et seq. as a Class Action pursuant to Cal. Code of Civ. Proc. § 382, on

19  behalf of a class of persons ("the Class" or "Class Members"), defined as all individuals who are

20  or previously were injured by Defendants' conduct in California in that they paid for Elmiron

21  prescriptions directly or indirectly without being told of the risk of serious and potentially

22  irreversible vision damage inherent in its use at any time during the period beginning June 15,

23  2018, and ending on the date as determined by the Court (the "Class Period").

24       286.    To the extent equitable tolling operates to toll claims by the Class against

25  Defendants, the Class Period should be adjusted accordingly.

26       287.    The Class Action meets the statutory prerequisites for the maintenance of a Class

27  Action as set forth in Cal. Code of Civ. Proc. § 382, in that:

28      a.    The persons who comprise the Class are so numerous that the joinder of all such

1   persons is impracticable and the disposition of their claims as a class will benefit

2   the parties and the Court. While Plaintiffs are informed and believe there are

3   thousands of patients who have taken or are taking Elmiron in California, who

4   would be members of the Class, the precise number of Class Members are

5   unknown to Plaintiffs but may be ascertained from various sources including

6   prescription records.

7   b.   There is a well-defined community of interest in that nearly all factual, legal,

8   statutory, declaratory, and injunctive relief issues that are raised in the Seventh

9   Cause of Action are common to the Class will apply uniformly to every Class

10   Member.

11   c.   The claims of the representative Plaintiffs are typical of the claims of the Class

12   Members, as all Class Members were and are similarly or identically harmed and

13   their claims arise from the same unlawful, deceptive, and unfair misconduct

14   engaged in by Defendants. Each Class Member paid for Elmiron prescriptions

15   directly or indirectly without being told of the risk of serious and potentially

16   irreversible vision damage inherent in its use.

17   d.   The representative Plaintiffs will fairly and adequately represent and protect the

18   interest of the Class, and has retained counsel who are competent and experienced

19   in Class Action litigation. There are no material conflicts between the claims of the

20   representative Plaintiffs and the Class Members that would make class certification

21   inappropriate. Counsel for the Class will vigorously assert the claims of all Class

22   Members.

23   e.   A class action is superior to other available methods for the fair and efficient

24   adjudication of this litigation because class treatment will obviate the need for

25   unduly and unnecessary duplicative litigation that is likely to result in the absence

26   of certification of this action pursuant to Cal. Code of Civ. Proc. § 382.

27   288.   In addition to meeting the statutory prerequisites to a Class Action, this cause of

28   action is properly maintained as a Class Action pursuant to Cal. Code of Civ. Proc. § 382, in that:

a.   Without class certification and determination of declaratory, injunctive, statutory, and other legal questions within the class format, prosecution of separate actions by individual Class Members will create the risk of:

1) Inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for the parties opposing the Class; and/or;

2) Adjudication with respect to individual Class Members which would as a practical matter be dispositive of interests of the other members not party to the adjudication or substantially impair or impede their ability to protect their interests.

b.   Common questions of law and fact exist as to the Class Members with respect to the practices and violations of California law by Defendants, and predominate over any question affecting only individual Class Members, and a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

1) The interests of the Class Members in individually controlling the prosecution or defense of separate actions in that the substantial expense of individual actions will be avoided to recover the relatively small amount of economic losses sustained by the individual Class Members when compared to the substantial expense and burden of individual prosecution of this litigation;

2) Class certification will obviate the need for unduly duplicative litigation that would create the risk of:

A. Inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for the Defendants and/or;

B. Adjudications with respect to individual Class Members would as a practical matter be dispositive of the interests of the other members not

1  parties to the adjudication or substantially impair or impede their ability to

2  protect their interests.

3  **Additional Allegations Regarding Punitive Damages (All Applicable Causes of Action)**

4     289.   The acts and omissions of Defendants described herein consisted of oppression,

5  fraud and/or malice and were done with advance knowledge, conscious disregard of the safety of

6  others and/or ratification by Defendants' officers, directors and/or managing agents.

7     290.   Defendants' actions amounted to actual malice or reckless indifference to the

8  likelihood of harm associated with their acts and omissions.

9     291.   Plaintiffs are entitled to punitive damages because Defendants misled,

10  misrepresented and/or withheld information and materials from the medical community and the

11  public at large, including Plaintiffs, concerning the safety profile, and, more specifically the serious

12  side effects and/or complications associated with Elmiron.

13    292.   With respect to unknowing physicians and consumers, Defendants downplayed,

14  understated or disregarded knowledge of the serious and permanent side effects and risks associated

15  with the use of Elmiron, despite available information that Elmiron was likely to cause serious side

16  effects and/or complications including but not limited to the drug interfering with the normal health,

17  healing, proliferation, migration and/or growth of cells including epithelial cells and RPE cells;

18  cause potentially irreversible vision issues and retinal; cause PPS-toxicity and/or PPS-maculopathy;

19  cause irreversible damage to vision, eyes and retinas; and cause maculopathy.

20    293.   Defendants' failure to warn otherwise uninformed physicians and consumers of

21  these serious side effects and/or complications was reckless and without regard for the public's

22  safety and welfare.

23    294.   Despite the fact that Defendants were or should have been in possession of evidence

24  demonstrating that Elmiron causes serious side effects, Defendants continued to market Elmiron by

25  providing false and misleading information with regard to safety and efficacy.

26    295.   Defendants failed to provide physicians and consumers, including Plaintiffs, with

27  available materials, information and warnings that would have ultimately dissuaded physicians from

28  prescribing Elmiron to consumers, consumers from purchasing and consuming Elmiron, thus

1  depriving otherwise uninformed physicians and consumers from weighing the true risks against the

2  benefits of prescribing and/or purchasing and ingesting Elmiron.

3      296.    Plaintiffs' injuries and damages are severe, permanent and will continue into the

4  future. As a result, Plaintiffs seek actual and punitive damages from Defendants.

5      297.    Defendants' conduct was committed with knowing, conscious and deliberate

6  disregard for the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to

7  punitive damages in an amount appropriate to punish the Defendants and deter them from similar

8  conduct in the future.

9      298.    Consequently, Defendants are liable for punitive damages in an amount to be

10  determined by the jury at trial.

11                              **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs seek judgment in Plaintiffs' favor as follows:

13          a.    Awarding compensatory damages, including but not limited to lost

14  earnings in the past; loss of earning capacity in the future; medical expenses incurred in the

15  past; medical expenses to be incurred in the future; other economic damages; serious injury;

16  pain and suffering; disability; physical impairment; disfigurement; mental anguish;

17  inconvenience; aggravation of a disease or physical defect; loss of capacity for the enjoyment

18  of life sustained in the past and to be sustained in the future; and other non-economic

19  damages;

20          b.    Awarding punitive damages;

21          c.    Awarding restitutionary disgorgement in favor of Plaintiffs and all

22  other similarly situated persons in California;

23          d.    Awarding the costs and expenses of this litigation to Plaintiffs;

24          e.    Awarding reasonable attorneys' fees and costs to Plaintiffs as

25  provided by law;

26          f.    Awarding pre-judgment and post-judgment interest to Plaintiffs; and

27          g.    For such further relief as this Court deems necessary, just and proper.

28

1   DATED:  June 15, 2022                  **SINGLETON SCHREIBER, LLP**

2

3                                          By:  _____

4                                          CHRISTOPHER R. RODRIGUEZ

5                                          Attorneys for Plaintiffs, MELISSA MORRISON, KELLIE VALENCIA, AND KARIE KUEHL

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Christopher R. Rodriguez SBN 212274 Andrew D. Bluth SBN 232387<br>Singleton Schreiber, LLP<br>1414 K Street, Suite 470<br>Sacramento, CA 95814<br>TELEPHONE NO.: (916) 248-8478 FAX NO.:<br>ATTORNEY FOR (Name): Plaintiffs Melissa Morrison, Kellie Valencia, and Karie Kuehl | ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br><br>06/15/2022 at 01:41:00 PM<br><br>Clerk of the Superior Court<br>By Gabriel Lopez, Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF San Diego
STREET ADDRESS: 330 W. Broadway
MAILING ADDRESS: 330 W. Broadway
CITY AND ZIP CODE: San Diego, CA 92101
BRANCH NAME:

CASE NAME: Morrison, et al. v. TEVA Branded Pharmaceutical Products R&D, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount demanded exceeds $25,000) | ☐ Limited<br>(Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 37-2022-00023174-CU-MT-CTL |
| | | | | JUDGE: Judge Ronald F. Frazier |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☒ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☒ Large number of separately represented parties   d. ☒ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action (specify): 7
5. This case ☒ is ☐ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: June 15, 2022

Christopher R. Rodriguez
(TYPE OR PRINT NAME)                           (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36) Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

American LegalNet, Inc.
www.Forms WorkFlow.com

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | | *FOR COURT USE ONLY* |
|---|---|---|
| STREET ADDRESS: 330 W Broadway | | |
| MAILING ADDRESS: 330 W Broadway | | |
| CITY AND ZIP CODE: San Diego CA 92101-3827 | | |
| BRANCH NAME: Central | | |

| Short Title: Morrison vs TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC [IMAGED] | |
|---|---|

| **NOTICE OF CONFIRMATION OF ELECTRONIC FILING** | CASE NUMBER: 37-2022-00023174-CU-MT-CTL |
|---|---|

San Diego Superior Court has reviewed the electronic filing described below. The fee assessed for processing and the filing status of each submitted document are also shown below.

**Electronic Filing Summary Data**

| | |
|---|---|
| Electronically Submitted By: | Christopher Rodriguez |
| On Behalf of: | Melissa Morrison, KELLIE VALENCIA, KARIE KUEHL |
| Transaction Number: | 21358315 |
| Court Received Date: | 06/15/2022 |
| Filed Date: | 06/15/2022 |
| Filed Time: | 01:41 PM |
| Fee Amount Assessed: | $1,435.00 |
| Case Number: | 37-2022-00023174-CU-MT-CTL |
| Case Title: | Morrison vs TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC |
| Case Title: | [IMAGED] |
| Location: | Central |
| Case Type: | Mass Tort |
| Case Category: | Civil - Unlimited |
| Jurisdictional Amount: | > 25000 |

| **Status** | **Documents Electronically Filed/Received** |
|---|---|
| Accepted | Complaint |
| Accepted | Civil Case Cover Sheet |
| Accepted | Original Summons |

**Comments**

**Clerk's Comments:**
**Events Scheduled**

| Hearing(s) | Date | Time | Location | Department |
|---|---|---|---|---|
| Civil Case Management Conference | 01/06/2023 | 10:30 AM | Central | C-65 |

**Electronic Filing Service Provider Information**

Service Provider:       LegalConnect
Email:                  support@legalconnect.com
Contact Person:         LEGALCONNECT Support
Phone:                  (800) 909-6859

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS:     330 West Broadway<br>MAILING ADDRESS:     330 West Broadway<br>CITY, STATE, & ZIP CODE: San Diego, CA  92101-3827<br>BRANCH NAME:     Central | |

PLAINTIFF(S):   Melissa Morrison et.al.

DEFENDANT(S): TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC FKA Teva Global  Respiratory Research, LLC et.al.

SHORT TITLE:    MORRISON VS TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC [IMAGED]

| STIPULATION TO USE ALTERNATIVE<br>DISPUTE RESOLUTION (ADR) | CASE NUMBER:<br>37-2022-00023174-CU-MT-CTL |
|---|---|

Judge:  Ronald F. Frazier                                                    Department:  C-65

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution (ADR) process.  Selection of any of these options will not delay any case management timelines.

☐ Mediation (court-connected)                  ☐ Non-binding private arbitration

☐ Mediation (private)                                ☐ Binding private arbitration

☐ Voluntary settlement conference (private)   ☐ Non-binding judicial arbitration (discovery until 15 days before trial)

☐ Neutral evaluation (private)                    ☐ Non-binding judicial arbitration (discovery until 30 days before trial)

☐ Other (specify e.g., private mini-trial, private judge, etc.): _____

_____

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) _____

_____

_____

Alternate neutral (for court Civil Mediation Program and arbitration only): _____

Date: _____         Date: _____

_____         _____
Name of Plaintiff                                    Name of Defendant

_____         _____
Signature                                            Signature

_____         _____
Name of Plaintiff's Attorney                         Name of Defendant's Attorney

_____         _____
Signature                                            Signature

If there are more parties and/or attorneys, please attach additional completed and fully executed sheets.

It is the duty of the parties to notify the court of any settlement pursuant to Cal. Rules of Court, rule 3.1385.  Upon notification of the settlement, the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court.

**IT IS SO ORDERED.**

Dated:  06/16/2022                              _____
                                                JUDGE OF THE SUPERIOR COURT



## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

CASE NUMBER: 37-2022-00023174-CU-MT-CTL      CASE TITLE: Morrison vs TEVA BRANDED PHARMACEUTICAL PRODU(

**NOTICE:** All plaintiffs/cross-complainants in a general civil case are required to serve a copy of the following three forms on each defendant/cross-defendant, together with the complaint/cross-complaint:
      (1) this Alternative Dispute Resolution (ADR) Information form (SDSC form #CIV-730),
      (2) the Stipulation to Use Alternative Dispute Resolution (ADR) form (SDSC form #CIV-359), _and_
      (3) the Notice of Case Assignment form (SDSC form #CIV-721).

Most civil disputes are resolved without filing a lawsuit, and most civil lawsuits are resolved without a trial. The courts, community organizations, and private providers offer a variety of Alternative Dispute Resolution (ADR) processes to help people resolve disputes without a trial. The San Diego Superior Court expects that litigants will utilize some form of ADR as a mechanism for case settlement before trial, and it may be beneficial to do this early in the case.

Below is some information about the potential advantages and disadvantages of ADR, the most common types of ADR, and how to find a local ADR program or neutral. A form for agreeing to use ADR is attached (SDSC form #CIV-359).

### Potential Advantages and Disadvantages of ADR
ADR may have a variety of advantages or disadvantages over a trial, depending on the type of ADR process used and the particular case:

| Potential Advantages | Potential Disadvantages |
|---|---|
| • Saves time | • May take more time and money if ADR does not resolve the dispute |
| • Saves money | |
| • Gives parties more control over the dispute resolution process and outcome | • Procedures to learn about the other side's case (discovery), jury trial, appeal, and other court protections may be limited or unavailable |
| • Preserves or improves relationships | |

### Most Common Types of ADR
You can read more information about these ADR processes and watch videos that demonstrate them on the court's ADR webpage at http://www.sdcourt.ca.gov/adr.

**Mediation:**  A neutral person called a "mediator" helps the parties communicate in an effective and constructive manner so they can try to settle their dispute. The mediator does not decide the outcome, but helps the parties to do so. Mediation is usually confidential, and may be particularly useful when parties want or need to have an ongoing relationship, such as in disputes between family members, neighbors, co-workers, or business partners, or when parties want to discuss non-legal concerns or creative resolutions that could not be ordered at a trial.

**Settlement Conference:**  A judge or another neutral person called a "settlement officer" helps the parties to understand the strengths and weaknesses of their case and to discuss settlement. The judge or settlement officer does not make a decision in the case but helps the parties to negotiate a settlement. Settlement conferences may be particularly helpful when the parties have very different ideas about the likely outcome of a trial and would like an experienced neutral to help guide them toward a resolution.

**Arbitration:**  A neutral person called an "arbitrator" considers arguments and evidence presented by each side and then decides the outcome of the dispute.  Arbitration is less formal than a trial, and the rules of evidence are usually relaxed. If the parties agree to binding arbitration, they waive their right to a trial and agree to accept the arbitrator's decision as final. With nonbinding arbitration, any party may reject the arbitrator's decision and request a trial. Arbitration may be appropriate when the parties want another person to decide the outcome of their dispute but would like to avoid the formality, time, and expense of a trial.

**Other ADR Processes:** There are several other types of ADR which are not offered through the court but which may be obtained privately, including neutral evaluation, conciliation, fact finding, mini-trials, and summary jury trials. Sometimes parties will try a combination of ADR processes. The important thing is to try to find the type or types of ADR that are most likely to resolve your dispute. Be sure to learn about the rules of any ADR program and the qualifications of any neutral you are considering, and about their fees.

## Local ADR Programs for Civil Cases

**Mediation:** The San Diego Superior Court maintains a Civil Mediation Panel of approved mediators who have met certain minimum qualifications and have agreed to charge $150 per hour for each of the first two (2) hours of mediation and their regular hourly rate thereafter in court-referred mediations.

On-line mediator search and selection:  Go to the court's ADR webpage at www.sdcourt.ca.gov/adr and click on the "Mediator Search" to review individual mediator profiles containing detailed information about each mediator including their dispute resolution training, relevant experience, ADR specialty, education and employment history, mediation style, and fees and to submit an on-line Mediator Selection Form (SDSC form #CIV-005).  The Civil Mediation Panel List, the Available Mediator List, individual Mediator Profiles, and Mediator Selection Form (CIV-005) can also be printed from the court's ADR webpage and are available at the Mediation Program Office or Civil Business Office at each court location.

**Settlement Conference:** The judge may order your case to a mandatory settlement conference, or voluntary settlement conferences may be requested from the court if the parties certify that: (1) settlement negotiations between the parties have been pursued, demands and offers have been tendered in good faith, and resolution has failed; (2) a judicially supervised settlement conference presents a substantial opportunity for settlement; and (3) the case has developed to a point where all parties are legally and factually prepared to present the issues for settlement consideration and further discovery for settlement purposes is not required. Refer to SDSC Local Rule 2.2.1 for more information. To schedule a settlement conference, contact the department to which your case is assigned.

**Arbitration:** The San Diego Superior Court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience.  Refer to SDSC Local Rules Division II, Chapter III and Code Civ. Proc. § 1141.10 et seq or contact the Arbitration Program Office at (619) 450-7300 for more information.

More information about court-connected ADR: Visit the court's ADR webpage at www.sdcourt.ca.gov/adr or contact the court's Mediation/Arbitration Office at (619) 450-7300.

**Dispute Resolution Programs Act (DRPA) funded ADR Programs:** The following community dispute resolution programs are funded under DRPA (Bus. and Prof. Code §§ 465 et seq.):
- In Central, East, and South San Diego County, contact the National Conflict Resolution Center (NCRC) at www.ncrconline.com or (619) 238-2400.
- In North San Diego County, contact North County Lifeline, Inc. at www.nclifeline.org or (760) 726-4900.

**Private ADR:** To find a private ADR program or neutral, search the Internet, your local telephone or business directory, or legal newspaper for dispute resolution, mediation, settlement, or arbitration services.

## Legal Representation and Advice

To participate effectively in ADR, it is generally important to understand your legal rights and responsibilities and the likely outcomes if you went to trial. ADR neutrals are not allowed to represent or to give legal advice to the participants in the ADR process. If you do not already have an attorney, the California State Bar or your local County Bar Association can assist you in finding an attorney. Information about obtaining free and low cost legal assistance is also available on the California courts website at *www.courtinfo.ca.gov/selfhelp/lowcost*.

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO** | |
|---|---|
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| DIVISION: | Central |
| TELEPHONE NUMBER: | (619) 450-7065 |

| PLAINTIFF(S) / PETITIONER(S): Melissa Morrison et.al. |
|---|
| DEFENDANT(S) / RESPONDENT(S): TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC et.al. |
| |
| MORRISON VS TEVA BRANDED PHARMACEUTICAL PRODUCTS R AND D INC [IMAGED] |

| **NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL)** | CASE NUMBER: 37-2022-00023174-CU-MT-CTL |
|---|---|

**CASE ASSIGNED FOR ALL PURPOSES TO:**

Judge:  Ronald F. Frazier                                    Department: C-65

**COMPLAINT/PETITION FILED:** 06/15/2022

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 01/06/2023 | 10:30 am | C-65 | Ronald F. Frazier |

**Due to the COVID-19 pandemic, all Case Management Conferences (CMCs) are being conducted virtually unless there is a court order stating otherwise.** Prior to the hearing date, visit the "virtual hearings" page for the most current instructions on how to appear for the applicable case-type/department on the court's website at www.sdcourt.ca.gov.

A Case Management Statement (JC Form #CM-110) must be completed by counsel for all parties and by all self-represented litigants and timely filed with the court at least 15 days prior to the initial CMC. (San Diego Superior Court (SDSC) Local Rules, rule 2.1.9; Cal. Rules of Court, rule 3.725).

All counsel of record and self-represented litigants must appear at the CMC, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of Alternative Dispute Resolution (ADR) options.

It is the duty of each plaintiff (and cross-complainant) to serve a copy of this Notice of Case Assignment and Case Management Conference (SDSC Form #CIV-721) with the complaint (and cross-complaint), the Alternative Dispute Resolution (ADR) Information Form (SDSC Form # CIV-730), a Stipulation to Use Alternative Dispute Resolution (ADR) (SDSC Form # CIV-359), and other documents on all parties to the action as set out in SDSC Local Rules, rule 2.1.5.

**TIME FOR SERVICE AND RESPONSE:** The following rules apply to civil cases except for collections cases under California Rules of Court, rule 3.740(a), unlawful detainer actions, proceedings under the Family Code, and other proceedings for which different service requirements are prescribed by law (Cal. Rules of Court, rule 3.110; SDSC Local Rules, rule 2.1.5):
- **Service:** The complaint must be served on all named defendants, and proof of service filed with the court within 60 days after filing the complaint. An amended complaint adding a defendant must be served on the added defendant and proof of service filed within 30 days after filing of the amended complaint. A cross-complaint against a party who has appeared in the action must be accompanied by proof of service on that party at the time it is filed. If it adds a new party, the cross-complaint must be served on all parties and proof of service on the new party must be filed within 30 days of the filing of the cross-complaint.
- **Defendant's appearance:** Unless a special appearance is made, each defendant served must generally appear (as defined in Code of Civ. Proc. § 1014) within 30 days of service of the complaint/cross-complaint.
- **Extensions:** The parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint (SDSC Local Rules, rule 2.1.6). If a party fails to serve and file pleadings as required under this rule, and has not obtained an order extending time to serve its pleadings, the court may issue an order to show cause why sanctions shall not be imposed.

**JURY FEES:** In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

**COURT REPORTERS:** Official Court Reporters are not normally available in civil matters, but may be requested in certain situations no later than 10 days before the hearing date. See SDSC Local Rules, rule 1.2.3 and Policy Regarding Normal Availability and Unavailability of Official Court Reporters (SDSC Form #ADM-317) for further information.

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** The court discourages any unnecessary delay in civil actions; therefore, continuances are discouraged and timely resolution of all actions, including submitting to any form of ADR is encouraged. The court encourages and expects the parties to consider using ADR options prior to the CMC. The use of ADR will be discussed at the CMC. Prior to the CMC, parties stipulating to the ADR process may file the Stipulation to Use Alternative Dispute Resolution (SDSC Form #CIV-359).

## NOTICE OF E-FILING REQUIREMENTS
## AND IMAGED DOCUMENTS

Effective April 15, 2021, e-filing is required for attorneys in represented cases in all limited and unlimited civil cases, pursuant to the San Diego Superior Court General Order: In Re Procedures Regarding Electronically Imaged Court Records, Electronic Filing and Access to Electronic Court Records in Civil and Probate Cases. Additionally, you are encouraged to review CIV-409 for a listing of documents that are not eligible for e-filing. E-filing is also encouraged, but not mandated, for self-represented litigants, unless otherwise ordered by the court. All e-filers are required to comply with the e-filing requirements set forth in Electronic Filing Requirements (Civil) (SDSC Form #CIV-409) and Cal. Rules of Court, rules 2.250-2.261.

All Civil cases are assigned to departments that are part of the court's "Imaging Program." This means that original documents filed with the court will be imaged, held for 30 days, and then destroyed, with the exception of those original documents the court is statutorily required to maintain. The electronic copy of the filed document(s) will be the official court record, pursuant to Government Code § 68150. Thus, original documents should not be attached to pleadings filed with the San Diego Superior Court, unless it is a document for which the law requires an original be filed. Any original documents necessary for a motion hearing or trial shall be lodged in advance of the hearing pursuant to California Rules of Court, rule 3.1302(b).

It is the duty of each plaintiff, cross-complainant, or petitioner to serve a copy of this Notice of Case Assignment and Case Management Conference (Civil) (SDSC Form #CIV-721) with the complaint, cross-complaint, or petition on all parties to the action.

On all pleadings filed after the initial case originating filing, all parties must, to the extent it is feasible to do so, place the words "IMAGED FILE" in all caps immediately under the title of the pleading on all subsequent pleadings filed in the action.

The official court file will be electronic and accessible at one of the kiosks located in the Civil Business Office and may be found on the court's website at www.sdcourt.ca.gov.

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br> Telephone No: 916-248-8478 | For Court Use Only |
|---|---|
| Attorney For: Plaintiff | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**07/01/2022** at 04:11:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |
| Ref. No. or File No.:<br>MORRISON V TEVA | |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |

| Plaintiff: | MELISSA MORRISON, an individual; et al. |
|---|---|
| Defendant: | TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>Global Respiratory Research, LLC; et al. |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  *a. Party served:*     ALZA CORPORATION
    *b. Person served:*   SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4.  *Address where the party was served:*   330 NORTH BRAND BOULEVARD SUITE 700, GLENDALE, CA 91203

5.  *I served the party:*
    a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Fri, Jun 24 2022 (2) at *(time)*: 12:40 PM
    (1)  [X]  (business)
    (2)  [ ]  (home)
    (3)  [ ]  (other) :

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [ ]  as an individual defendant.
    b.  [ ]  as the person sued under the fictitious name of *(specify)*:
    c.  [ ]  as occupant.
    d.  [X]  On behalf of *(specify)*:   ALZA CORPORATION
       under the following Code of Civil Procedure section:

    [X]  416.10 (corporation)            [ ]  415.95 (business organization, form unknown)
    [ ]  416.20 (defunct corporation)    [ ]  416.60 (minor)
    [ ]  416.30 (joint stock company/association)   [ ]  416.70 (ward or conservatee)
    [ ]  416.40 (association or partnership)   [ ]  416.90 (authorized person)
    [ ]  416.50 (public entity)          [ ]  415.46 (occupant)
    [ ]  other:



Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF
SERVICE
SUMMONS**

*7273085*
*(16095303)*
Page 1 of 2

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478 | For Court Use Only |
|---|---|
| Attorney For:  Plaintiff   _Ref. No. or File No.:_<br>MORRISON V TEVA | |
| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | |
| _Plaintiff:_  MELISSA MORRISON, an individual; et al.<br>_Defendant:_  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>  Global Respiratory Research, LLC; et al. | |

| **PROOF OF SERVICE<br>SUMMONS** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.  **Person who served papers**
   a.  Name:          Douglas Forrest
   b.  Address:       **FIRST LEGAL**
                    1814 I Street
                    SACRAMENTO, CA 95814
   c.  Telephone number:   (916) 444-5111
   d.  **The fee** for service was:   70.63
   e.  I am:
      (1)  ☐  not a registered California process server.
      (2)  ☐  exempt from registration under Business and Professions Code section 22350(b).
      (3)  ☒  a registered California process server:
         (i)   ☐ owner  ☐ employee  ☒ independent contractor
         (ii)  Registration No:  5141, Los Angeles
         (iii)  County:  Los Angeles

8.  _I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct._



       06/27/2022
        _(Date)_                       _Douglas Forrest_



| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478<br><br>  Attorney For: Plaintiff | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/01/2022** at 04:11:00 PM<br><br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| Ref. No. or File No.: |
|---|
| MORRISON V TEVA |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |

| | |
|---|---|
| Plaintiff: | MELISSA MORRISON, an individual; et al. |
| Defendant: | TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC; et al. |

| PROOF OF SERVICE SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number: |
|---|---|---|---|---|
| | | | | 37-2022-00023174-CU-MT-CTL |

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.   *a.*  *Party served:*   JOHNSON & JOHNSON
  *b.*  *Person served:*   SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4. *Address where the party was served:*   330 N Brand Blvd Suite 700, Glendale, CA 91203

5. *I served the party:*
  a. **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)* Fri, Jun 24 2022 (2) at *(time)* 12:40 PM
  (1)  [X]  **(business)**
  (2)  [ ]  **(home)**
  (3)  [ ]  **(other)**

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a.  [ ]  as an individual defendant.
  b.  [ ]  as the person sued under the fictitious name of *(specify)*
  c.  [ ]  as occupant.
  d.  [X]  On behalf of *(specify)*  JOHNSON & JOHNSON
      under the following Code of Civil Procedure section:

| | |
|---|---|
| [X] 416.10 (corporation) | [ ] 415.95 (business organization, form unknown) |
| [ ] 416.20 (defunct corporation) | [ ] 416.60 (minor) |
| [ ] 416.30 (joint stock company/association) | [ ] 416.70 (ward or conservatee) |
| [ ] 416.40 (association or partnership) | [ ] 416.90 (authorized person) |
| [ ] 416.50 (public entity) | [ ] 415.46 (occupant) |
| [ ] other: | |



Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF
SERVICE
SUMMONS**

7273057
*(16059306)*
Page 1 of 2

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>Telephone No: 916-248-8478 | | For Court Use Only |
|---|---|---|
| Attorney For: Plaintiff | Ref. No. or File No.:<br>MORRISON V TEVA | |

| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | |
|---|---|

| Plaintiff: MELISSA MORRISON, an individual; et al.<br>Defendant: TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>Global Respiratory Research, LLC; et al. | |
|---|---|

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a. Naz eJ                          Douglas Forrest
   b. AddressJ                         **FIRST LEGAL**
                                       1814 I Street
                                       SACRAMENTO, CA 95814
   c. Telephone nuz berJ               (916) 444-5111
   d. **The fee** for service wasJ     70.63
   e. I az J
      (1) ☐ not a registered California process server.
      (2) ☐ exez pt froz  registration under Business and Professions Code section 22350(b).
      (3) ☒ a registered California process serverJ
         (i)   ☐ owner   ☐ ez ployee   ☒ independent contractor
         (ii)  Registration NoJ   5141, Los Angeles
         (iii) CountyJ   Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*



06/27/2022
_____                    _____
*(Date)*                                 *Douglas Forrest*



ɹudicial Council Forᴢ  POS-010
Rule 2.150.(a)&(b) Rev ᴑanuary 1, 2007

**PROOF OF
SERVICE
SUMMONS**

*7273057
(16059306)*
Page 2 of 2

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478 | For Court Use Only |
|---|---|
|   Attorney For:   Plaintiff      Ref. No. or File No.:<br>MORRISON V TEVA | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**07/01/2022** at 04:11:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | |
|---|---|
| Plaintiff:   MELISSA MORRISON, an individual; et al.<br>Defendant:   TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>          Global Respiratory Research, LLC; et al. | |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.   *a.*   *Party served:*     rANSSEN ORTHO LLC
  *b.*   *Person served:*   SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4. *Address where the party was served:*   330 N Brand Blvd Suite 700, Glendale, CA 91203

5. *I served the party:*
  a. **by personal service.**   I personally delivered the docuz ents listed in itez  2 to the party or person authori: ed to receive
      service of process for the party (1) on *(date)*J Fri, run 24 2022 (2) at *(time)*J 12J40 PM

  (1)   [ **X** ]   (business)
  (2)   [    ]   (home)
  (3)   [    ]   (other) J

6. The "Notice to the Person Served" (on the suz z ons) was coz pleted as followsJ
  a.   [    ]   as an individual defendant.
  b.   [    ]   as the person sued under the fictitious naz e of *(specify)*J
  c.   [    ]   as occupant.
  d.   [ **X** ]   On behalf of *(specify)*J   rANSSEN ORTHO LLC
      under the following Code of Civil Procedure sectionJ

| | |
|---|---|
| [   ]  416.10 (corporation) | [   ]  415.95 (business organi: ation, forz  unknown) |
| [   ]  416.20 (defunct corporation) | [   ]  416.60 (z inor) |
| [   ]  416.30 (joint stock coz pany/association) | [   ]  416.70 (ward or conservatee) |
| [   ]  416.40 (association or partnership) | [   ]  416.90 (authori: ed person) |
| [   ]  416.50 (public entity) | [   ]  415.46 (occupant) |
| [ **X** ]  otherJ   LLC | |



| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478<br><br>  Attorney For:  Plaintiff | For Court Use Only |
|---|---|

Ref. No. or File No.:
MORRISON V TEVA

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:  MELISSA MORRISON, an individual; et al.
Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
                 Global Respiratory Research, LLC; et al.

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.   **Person who served papers**
    a.   Naz eJ                              Douglas Forrest
    b.   AddressJ                          **FIRST LEGAL**
                                                1814 I Street
                                                SACRAMENTO, CA 95814
    c.   Telephone nuz berJ         (916) 444-5111
    d.   **The fee** for service wasJ    70.63
    e.   I az J
        (1)  ☐   not a registered California process server.
        (2)  ☐   exez pt froz  registration under Business and Professions Code section 22350(b).
        (3)  ☒   a registered California process serverJ
            (i)     ☐ owner   ☐ ez ployee   ☒ independent contractor
            (ii)    Registration NoJ   5141, Los Angeles
            (iii)   CountyJ   Los Angeles

8.   *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*



_____            _____
06/27/2022
*(Date)*                                                    *Douglas Forrest*



**PROOF OF
SERVICE
SUMMONS**

*7273056
(16059309)*
Page 2 of 2

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>Telephone No: 916-248-8478<br><br>Attorney For:   Plaintiff | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/01/2022** at 04:11:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| | |
|---|---|
| | Ref. No. or File No.:<br>MORRISON V TEVA |

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:   MELISSA MORRISON, an individual; et al.

Defendant:   TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
Global Respiratory Research, LLC; et al.

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  *a.*  *Party served:*   rANSSEN PHARMACEUTICALS, INC., f/k/a OrthoMcNeil- ranssen Pharz aceuticals, Inc., f/k/a ranssen Pharz aceutica Inc.
    *b.*  *Person served:*   SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4.  *Address where the party was served:*   330 N Brand Blvd Suite 700, Glendale, CA 91203

5.  *I served the party:*
    a. **by personal service.**   I personally delivered the docuz ents listed in itez  2 to the party or person authori: ed to receive service of process for the party (1) on *(date)*J Fri, man 24 2022 (2) at *(time)*J 12J40 PM

    (1)  [ X ]   **(business)**
    (2)  [   ]   **(home)**
    (3)  [   ]   **(other)** J

6.  The "Notice to the Person Served" (on the suz  z ons) was coz  pleted as followsJ
    a.  [   ]   as an individual defendant.
    b.  [   ]   as the person sued under the fictitious naz e of *(specify)*J
    c.  [   ]   as occupant.
    d.  [ X ]   On behalf of *(specify)*J   rANSSEN PHARMACEUTICALS, INC., f/k/a OrthoMcNeil- ranssen Pharz aceuticals, Inc., f/k/a ranssen Pharz aceutica Inc.
    under the following Code of Civil Procedure sectionJ

    | | |
    |---|---|
    | [ X ]   416.10 (corporation) | [   ]   415.95 (business organi: ation, forz  unknown) |
    | [   ]   416.20 (defunct corporation) | [   ]   416.60 (z  inor) |
    | [   ]   416.30 (joint stock coz  pany/association) | [   ]   416.70 (ward or conservatee) |
    | [   ]   416.40 (association or partnership) | [   ]   416.90 (authori: ed person) |
    | [   ]   416.50 (public entity) | [   ]   415.46 (occupant) |
    | [   ]   otherJ | |



PROOF OF
SERVICE
SUMMONS

| Attorney or Party without Attorney: <br> CHRISTOPHER R. RODRIGUEZ (SBN 212274) <br> SINGLETON SCHREIBER LLP <br> 1414 K STREET SUITE 470 <br> SACRAMENTO, CA 95814 <br> Telephone No: 916-248-8478 <br><br> Attorney For:  Plaintiff | For Court Use Only |
|---|---|

Ref. No. or File No.:
MORRISON V TEVA

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:   MELISSA MORRISON, an individual; et al.

Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
Global Respiratory Research, LLC; et al.

| PROOF OF SERVICE SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number: <br> 37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.  **Person who served papers**
   a.  Naz eꟷ               Douglas Forrest
   b.  Addressꟷ            **FIRST LEGAL**
                              1814 I Street
                              SACRAMENTO, CA 95814
   c.  Telephone nuz berꟷ    (916) 444-5111
   d.  **The fee** for service wasꟷ   70.63
   e.  I az ꟷ
      (1)  ☐  not a registered California process server.
      (2)  ☐  exez pt froz  registration under Business and Professions Code section 22350(b).
      (3)  ☒  a registered California process serverꟷ
          (i)  ☐ owner  ☐ ez ployee  ☒ independent contractor
          (ii)  Registration Noꟷ  5141, Los Angeles
          (iii)  Countyꟷ  Los Angeles

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*



06/27/2022
*(Date)*                                          *Douglas Forrest*



| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478<br>  Attorney For:  Plaintiff | *For Court Use Only* |
|---|---|
| | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**07/01/2022** at 04:11:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

*Ref. No. or File No.:*
MORRISON V TEVA

| *Insert name of Court, and Judicial District and Branch Court:*<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |
|---|
| *Plaintiff:*  MELISSA MORRISON, an individual; et al. |
| *Defendant:*  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>  Global Respiratory Research, LLC; et al. |

| **PROOF OF SERVICE<br>SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  *a.  Party served:*     JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a Johnson & Johnson Research & Development, LLC
    *b.  Person served:*   SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4.  *Address where the party was served:*   330 N Brand Blvd Suite 700, Glendale, CA 91203

5.  *I served the party:*
    a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)* Fri, Jun 24 2022 (2) at *(time)* 12:40 PM
    (1)  [ X ]  (business)
    (2)  [   ]  (home)
    (3)  [   ]  (other)

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [   ]  as an individual defendant.
    b.  [   ]  as the person sued under the fictitious name of *(specify)*:
    c.  [   ]  as occupant.
    d.  [ X ]  On behalf of *(specify)*:  JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a Johnson & Johnson Research & Development, LLC
             under the following Code of Civil Procedure section:
             [   ]  416.10 (corporation)          [   ]  415.95 (business organization, form  unknown)
             [   ]  416.20 (defunct corporation)   [   ]  416.60 (minor)
             [   ]  416.30 (joint stock company/association)   [   ]  416.70 (ward or conservatee)
             [   ]  416.40 (association or partnership)   [   ]  416.90 (authorized person)
             [   ]  416.50 (public entity)          [   ]  415.46 (occupant)
             [ X ]  other:   LLC



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF<br>SERVICE<br>SUMMONS** | *7273087*<br>*(15069302)*<br>Page 1 of 2 |
|---|---|---|

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478 | | For Court Use Only |
|---|---|---|
| Attorney For: Plaintiff | Ref. No. or File No.:<br>MORRISON V TEVA | |
| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | | |
| Plaintiff: MELISSA MORRISON, an individual; et al.<br>Defendant: TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>  Global Respiratory Research, LLC; et al. | | |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.  **Person who served papers**
    a.  Naz eJ                          Douglas Forrest
    b.  AddressJ                     **FIRST LEGAL**
                                              1814 I Street
                                              SACRAMENTO, CA 95814
    c.  Telephone nuz berJ      (916) 444-5111
    d.  **The fee** for service wasJ   70.63
    e.  I az J
        (1) ☐   not a registered California process server.
        (2) ☐   exez pt froz  registration under Business and Professions Code section 22350(b).
        (3) ☒   a registered California process serverJ
              (i)   ☐ owner  ☐ ez ployee  ☒ independent contractor
              (ii)  Registration NoJ  5141, Los Angeles
              (iii) CountyJ  Los Angeles

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*



06/27/2022
_____                    _____
(Date)                                              Douglas Forrest



**PROOF OF
SERVICE
SUMMONS**

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>Telephone No: 916-248-8478<br><br>Attorney For:  Plaintiff | For Court Use Only<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/01/2022** at 04:11:00 PM<br><br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |
|---|---|
| Ref. No. or File No.:<br>MORRISON V TEVA | |

| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |
|---|

| Plaintiff:  MELISSA MORRISON, an individual; et al. |
|---|
| Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>Global Respiratory Research, LLC; et al. |

| **PROOF OF SERVICE<br>SUMMONS** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  *a.  Party served:*      ORTHO-MCNEIL PHARMACEUTICAL, LLC
    *b.  Person served:*    SARAI MARIN, INTAKE SPECIALIST. CT CORPORATION SYSTEM. REGISTERED AGENT

4.  *Address where the party was served:*    330 N Brand Blvd Suite 700, Glendale, CA 91203

5.  *I served the party:*
    a. **by personal service.**    I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Fri, Jun 24 2022 (2) at *(time)*: 12:40 PM
    (1)  [ X ]   (business)
    (2)  [   ]   (home)
    (3)  [   ]   (other) :

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [   ]   as an individual defendant.
    b.  [   ]   as the person sued under the fictitious name of *(specify)*:
    c.  [   ]   as occupant.
    d.  [ X ]   On behalf of *(specify)*:   ORTHO-MCNEIL PHARMACEUTICAL, LLC
            under the following Code of Civil Procedure section:
        [   ]   416.10 (corporation)                    [   ]   415.95 (business organization, form unknown)
        [   ]   416.20 (defunct corporation)            [   ]   416.60 (minor)
        [   ]   416.30 (joint stock company/association)   [   ]   416.70 (ward or conservatee)
        [   ]   416.40 (association or partnership)      [   ]   416.90 (authorized person)
        [   ]   416.50 (public entity)                  [   ]   415.46 (occupant)
        [ X ]   other:   LLC



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF<br>SERVICE<br>SUMMONS** | *7273085*<br>*(16059300)*<br>Page 1 of 2 |
|---|---|---|

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478 | For Court Use Only |
|---|---|

| Attorney For:  Plaintiff | Ref. No. or File No.:<br>MORRISON V TEVA |
|---|---|

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:  MELISSA MORRISON, an individual; et al.

Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
                     Global Respiratory Research, LLC; et al.

| **PROOF OF SERVICE<br>SUMMONS** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.   **Person who served papers**
   a.   Name:                             Douglas Forrest
   b.   Address:                        **FIRST LEGAL**
                                                 1814 I Street
                                                 SACRAMENTO, CA 95814
   c.   Telephone number:         (916) 444-5111
   d.   **The fee** for service was:     109.25
   e.   I am:
         (1)   ☐   not a registered California process server.
         (2)   ☐   exempt from registration under Business and Professions Code section 22350(b).
         (3)   ☒   a registered California process server:
                 (i)      ☐ owner   ☐ employee   ☒ independent contractor
                 (ii)     Registration No:   5141, Los Angeles
                 (iii)    County:   Los Angeles

8.   *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*



06/27/2022
_____                    _____
        *(Date)*                                                    *Douglas Forrest*



PROOF OF
SERVICE
SUMMONS

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No: 916-248-8478<br><br>  Attorney For:  Plaintiff | For Court Use Only<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br><br>**07/13/2022** at 10:24:00 AM<br>Clerk of the Superior Court<br>By Shameka Simpson,Deputy Clerk |
|---|---|

| | Ref. No. or File No.:<br>MORRISON V TEVA | |

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:   MELISSA MORRISON, an individual; et al.

Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
Global Respiratory Research, LLC; et al.

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC
    FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION
    TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  *a.  Party served:*        DR. C. LOWELL PARSONS, MD, an individual
    *b.  Person served:*     Jane Doe. Info desk , Hispanic , Female , Age: 35 , Hair: Black , Eyes: Brown , Height: 5'7" , Weight: 135

4.  *Address where the party was served:*    200 W Arbor Drive , San Diego, CA 92103

5.  *I served the party:*
    b. **by substituted service.**    On: Fri, Jul 08 2022 at: 10:08 AM I left the documents listed in item 2 with or in the presence of:
    Jane Doe. Info desk , Hisp, F, Age: 35 , Hair: Black , Eyes: Brown , Height: 5'7" , Weight: 135

    (1)  [X]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be
              served. I informed him or her of the general nature of the papers.
    (2)  [ ]   **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of
              the party. I informed him or her of the general nature of the papers.
    (3)  [ ]   **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the
              person to be served, other than a United States Postal Service post office box. I informed him or her of
              the general nature of the papers.
    (4)  [X]  **(Declaration of Mailing)** is attached.
    (5)  [X]  **(Declaration of Diligence)** attached stating actions taken first to attempt personal service.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
    a.  [X]   as an individual defendant.
    b.  [ ]   as the person sued under the fictitious name of *(specify)*:
    c.  [ ]   as occupant.
    d.  [ ]   On behalf of *(specify)*:
              under the following Code of Civil Procedure section:
              [ ] 416.10 (corporation)                    [ ] 415.95 (business organization, form unknown)
              [ ] 416.20 (defunct corporation)            [ ] 416.60 (minor)
              [ ] 416.30 (joint stock company/association) [ ] 416.70 (ward or conservatee)
              [ ] 416.40 (association or partnership)      [ ] 416.90 (authorized person)
              [ ] 416.50 (public entity)                  [ ] 415.46 (occupant)
              [ ] other:



| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | PROOF OF SERVICE<br>SUMMONS | *7322115*<br>*(16095366)*<br>Page 1 of 2 |
|---|---|---|

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>  Telephone No:  916-248-8478 | For Court Use Only |
|---|---|
|   Attorney For:  Plaintiff     Ref. No. or File No.:<br>MORRISON V TEVA | |

| Insert name of Court, and Judicial District and Branch Court:<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |
|---|
| Plaintiff:  MELISSA MORRISON, an individual; et al.<br>Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>            Global Respiratory Research, LLC; et al. |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7.   **Person who served papers**
   a.   Name:                    Lawrence (Eric) Thayer
   b.   Address:                 **FIRST LEGAL**
                                 1814 I Street
                                 SACRAMENTO, CA 95814
   c.   Telephone number:        (916) 444-5111
   d.   **The fee** for service was:   109.25
   e.   I am:
        (1)  ☐    not a registered California process server.
        (2)  ☐    exempt from registration under Business and Professions Code section 22350(b).
        (3)  ☒    a registered California process server:
             (i)    ☐ owner   ☐ employee   ☒ independent contractor
             (ii)   Registration No:  3266, San Diego
             (iii)  County:  San Diego County

8.   *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*


_____
07/08/2022
*(Date)*                              *Lawrence (Eric) Thayer*

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>　Telephone No:　916-248-8478<br><br>　Attorney For:　Plaintiff | | *For Court Use Only* |
|---|---|---|
| | *Ref. No. or File No.:*<br>MORRISON V TEVA | |
| *Insert name of Court, and Judicial District and Branch Court:*<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | | |
| *Plaintiff:*　MELISSA MORRISON, an individual; et al.<br>*Defendant:*　TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>　　　　　　Global Respiratory Research, LLC; et al. | | |

| PROOF OF SERVICE<br>By Mail | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1.  *I am over the age of 18 and not a party to this action. I am employed in the county where the mailing occurred.*

2.  I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.  By placing a true copy of each document in the United States mail, in a sealed envelope by **First Class** mail with postage prepaid as follows:
    a. Date of Mailing: Fri, Jul 8, 2022
    b. Place of Mailing: SACRAMENTO, CA
    c. Addressed as follows: DR. C. LOWELL PARSONS, MD, an individual
    　　　　　　　　　　　　200 W Arbor Drive , San Diego, CA 92103

4.  *I am readily familiar with the business practice for collection and processing of correspondence as deposited with the U.S. Postal Service on Fri, Jul 8, 2022 in the ordinary course of business.*

　　　　　　　　　　　　　　　　　　　　Recoverable cost Per CCP 1033.5(a)(4)(B)

5.  *Person Serving:*
    a. Michael Morris
    **b. FIRST LEGAL**
    　1814 I Street
    　SACRAMENTO, CA 95814
    c. (916) 444-5111

    **d.** *The Fee* for Service was:
    **e.** I am: A Registered California Process Server

6.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

| 07/08/2022 | |
|---|---|
| *(Date)* | *Michael Morris* |



Judicial Council Form　　　　　　**PROOF OF SERVICE**　　　　　　*7322115*
Rule 2.150.(a)&(b) Rev January 1, 2007　　　**BY MAIL**　　　　　　*(16095366)*

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>   Telephone No: 916-248-8478 | *For Court Use Only* |
|---|---|
| Attorney For:  Plaintiff          Ref. No. or File No.:<br>MORRISON V TEVA | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**07/11/2022** at 05:55:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| Insert name of Court, and Judicial District and Branch Court: |
|---|
| SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO |

| Plaintiff: | MELISSA MORRISON, an individual; et al. |
|---|---|
| Defendant: | TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>Global Respiratory Research, LLC; et al. |

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.   *a.  Party served:*    TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC.
     *b.  Person served:*  Latrice Young, Authorized Representative at Corporation Service Company, Registered Agent

4. *Address where the party was served:*  1201 Hays St, Tallahassee, FL 32301

5. *I served the party:*
     a. **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Mon, Jun 27 2022 (2) at *(time)*: 11:30 AM
     (1)  [ X ]  **(business)**
     (2)  [   ]  **(home)**
     (3)  [   ]  **(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
     a.  [   ]  as an individual defendant.
     b.  [   ]  as the person sued under the fictitious name of *(specify)*:
     c.  [   ]  as occupant.
     d.  [ X ]  On behalf of *(specify)*:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC.
       under the following Code of Civil Procedure section:

   | | |
   |---|---|
   | [ X ] 416.10 (corporation) | [   ] 415.95 (business organization, form unknown) |
   | [   ] 416.20 (defunct corporation) | [   ] 416.60 (minor) |
   | [   ] 416.30 (joint stock company/association) | [   ] 416.70 (ward or conservatee) |
   | [   ] 416.40 (association or partnership) | [   ] 416.90 (authorized person) |
   | [   ] 416.50 (public entity) | [   ] 415.46 (occupant) |
   | [   ] other: | |



| | | |
|---|---|---|
| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF<br>SERVICE<br>SUMMONS** | 7286145<br>(16095555)<br>Page 1 of 2 |

<table>
<tr><td colspan="2">Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>Telephone No: 916-248-8478<br><br>Attorney For: Plaintiff</td><td>For Court Use Only</td></tr>
</table>

Ref. No. or File No.:
MORRISON V TEVA

Insert name of Court, and Judicial District and Branch Court:
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

Plaintiff:  MELISSA MORRISON, an individual; et al.
Defendant:  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva
Global Respiratory Research, LLC; et al.

| PROOF OF SERVICE SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>37-2022-00023174-CU-MT-CTL |
| --- | --- | --- | --- | --- |

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
   a. Name:                           Sabrita Thurman-Newby
   b. Address:                        **FIRST LEGAL**
                                      1814 I Street
                                      SACRAMENTO, CA 95814
   c. Telephone number:              (916) 444-5111
   d. **The fee** for service was:    156.63
   e. I am:
      (1)  [X]  not a registered California process server.
      (2)  [ ]  exempt from registration under Business and Professions Code section 22350(b).
      (3)  [ ]  a registered California process server:
           (i)   [ ] owner  [ ] employee  [ ] independent contractor
           (ii)  Registration No:
           (iii) County:

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

06/27/2022                                        _Sabrita Thurman-Newby_
_____                                     _____
(Date)                                             Sabrita Thurman-Newby



Judicial Council Form POS-010            **PROOF OF**              7286145
Rule 2.150.(a)&(b) Rev January 1, 2007   **SERVICE**              (16095555)
                                         **SUMMONS**              Page 2 of 2

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br>*Telephone No:* 916-248-8478<br><br>*Attorney For:* Plaintiff | *For Court Use Only*<br><br>**ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**07/13/2022** at 11:37:00 AM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |
|---|---|

| *Ref. No. or File No.:*<br>MORRISON V TEVA |
|---|

*Insert name of Court, and Judicial District and Branch Court:*
SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO

*Plaintiff:* MELISSA MORRISON, an individual; et al.
*Defendant:* TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva Global Respiratory Research, LLC; et al.

| **PROOF OF SERVICE<br>SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

1. *At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; NOTICE OF CONFIRMATION OF ELECTRONIC FILING; ADR INFORMATION; NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE (CIVIL); STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR)

3.   *a.*   *Party served:*   TEVA PHARMACEUTICALS USA, INC.
    *b.*   *Person served:*   Latrice Young, Authorized Representative at Corporation Service Company, Registered Agent

4. *Address where the party was served:*   1201 Hays St, Tallahassee, FL 32301

5. *I served the party:*
  a. **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: Mon, Jun 27 2022 (2) at *(time)*: 11:30 AM

  (1)   [ X ]   **(business)**
  (2)   [  ]   **(home)**
  (3)   [  ]   **(other)** :

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a.   [  ]   as an individual defendant.
  b.   [  ]   as the person sued under the fictitious name of *(specify)*:
  c.   [  ]   as occupant.
  d.   [ X ]   On behalf of *(specify)*:   TEVA PHARMACEUTICALS USA, INC.
      under the following Code of Civil Procedure section:

| | |
|---|---|
| [ X ]  416.10 (corporation) | [  ]  415.95 (business organization, form unknown) |
| [  ]  416.20 (defunct corporation) | [  ]  416.60 (minor) |
| [  ]  416.30 (joint stock company/association) | [  ]  416.70 (ward or conservatee) |
| [  ]  416.40 (association or partnership) | [  ]  416.90 (authorized person) |
| [  ]  416.50 (public entity) | [  ]  415.46 (occupant) |
| [  ]  other: | |



Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF
SERVICE
SUMMONS**

*7286135*
*(16095550)*
**Page 1 of 2**

| Attorney or Party without Attorney:<br>CHRISTOPHER R. RODRIGUEZ (SBN 212274)<br>SINGLETON SCHREIBER LLP<br>1414 K STREET SUITE 470<br>SACRAMENTO, CA 95814<br> Telephone No: 916-248-8478<br><br> Attorney For:  Plaintiff | | *For Court Use Only* |
|---|---|---|
| | *Ref. No. or File No.:*<br>MORRISON V TEVA | |
| *Insert name of Court, and Judicial District and Branch Court:*<br>SUPERIOR COURT FOR THE STATE OF CALIFORNIA COUNTY OF SAN DIEGO | | |
| *Plaintiff:*  MELISSA MORRISON, an individual; et al.<br>*Defendant:*  TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC., f/k/a Teva<br>  Global Respiratory Research, LLC; et al. | | |

| **PROOF OF SERVICE<br>SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>37-2022-00023174-CU-MT-CTL |
|---|---|---|---|---|

Recoverable cost Per CCP 1033.5(a)(4)(B)

7. **Person who served papers**
    a.  Name:            Sabrita Thurman-Newby
    b.  Address:        **FIRST LEGAL**
                         1814 I Street
                         SACRAMENTO, CA 95814
    c.  Telephone number:    (916) 444-5111
    d.  **The fee** for service was:  281.25
    e.  I am:
        (1)  [ X ]  not a registered California process server.
        (2)  [   ]  exempt from registration under Business and Professions Code section 22350(b).
        (3)  [   ]  a registered California process server:
            (i)    [   ] owner   [   ] employee   [   ] independent contractor
            (ii)   Registration No:
            (iii)  County:

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

06/27/2022       *Sabrita Thurman-Newby*<br>(Date)                      Sabrita Thurman-Newby



Judicial Council Form POS-010
Rule 2.150.(a)&(b) Rev January 1, 2007

**PROOF OF<br>SERVICE<br>SUMMONS**

7286135<br>(16095550)<br>Page 2 of 2